## FRANK HOLMES GRINDSTAFF v. STATE.

No. A-10506.   Jan. 30, 1946.
(165 P. 2d 846.)

Paul Showalter and Looper & Sturdevant, all of Oklahoma City, for plaintiff in error.

Randell S. Cobb, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, P. J.  The defendant, Frank Holmes Grindstaff, was charged in the district court of Oklahoma county with the crime of murder; was tried, convicted of manslaughter in the first degree, and sentenced to serve four years in the State Penitentiary, and has appealed.

The defendant was charged with shooting and killing one Joe Young with a .410 gauge shotgun in one of the tourist cabins forming the Sunset Tourist Court located at 2909 South Walnut street, in Oklahoma City.

The defendant was married but not living with his wife at the time of the homicide.  On June 6, 1943, the defendant and one Edith Roberts rented cabin No. 12 of the Sunset Tourist Cabins, giving their names to the owner and operator of the cabins as Mr. and Mrs. Frank

Grindstaff. They continued to occupy this cabin from June 6, 1943, to the date of the homicide on July 22, 1943, although on some occasions Edith Roberts stayed overnight at her home at 700 S.W. 4th street, in Oklahoma City. The deceased, aged 22, and his wife lived in an apartment in the vicinity of the cabin occupied by the defendant.

The defendant and deceased had been acquainted for two or three months before the homicide occurred. They had been doing carpenter work together at Midwest City. They would drive to their work each day in defendant's automobile. On the day of the homicide, the defendant and the deceased did not go to work, but spent the day loafing and drinking beer. About 6 o'clock p. m., they returned to defendant's cabin. Edith Roberts testified that she was there and started a fuss with defendant because the defendant had been drinking. She and the defendant had considerable argument, during which the defendant shoved her down on the bed and, also, knocked her to the floor and cursed and abused her. During this time, the defendant told the deceased to go home as the quarrel was between him and Edith, to which the deceased said, "If you will give me a good reason, I'll go, but you know that I don't want to go home." The deceased gave the defendant his car keys and got up and left.

Edith Roberts also testified that during the altercation between defendant and Edith, she took her purse and left the cabin, but after she had gotten across the railroad track the defendant called her back and she came back into the house and, in a few minutes, the cursing and abusing by the defendant started again. That after Joe Young had been gone about five minutes, he came back into the cabin and went into the bathroom.

That he came out of the bathroom in a few minutes and sat down in the room where she and the defendant were quarreling. According to her testimony, Grindstaff commenced to tell the deceased to go home and finally the deceased said, "If you will just take me and my tools home, when I get there with you, I'll knock your block off." That when she heard this, she jumped and ran out the back door and had just stepped off of the steps when she heard a shot. That she had run past two of the cabins and turned and saw the defendant standing in front of his cabin. The she saw some people standing outside the cabin and asked them where Joe was and they told her he was in one of the cabins up in front. That she went to this cabin and saw the deceased had been shot and the right side of his face was cut from the glass window in the door.

According to the testimony of the defendant, the deceased died solely because of accident and misfortune which occurred by the defendant's trying to wrest a gun from the deceased. His exact testimony in respect to this is as follows:

"Q. Now while you were sitting there, just tell this jury exactly what happened. A. Well, Joe wanted me to take him and his tools home and he cursed me and wanted me to do him a favor, to take him and his tools home and he would knock my damn head off, my block off—He was coming at me all of the time, and when he did that I raised my chair up and he said, 'I could kill you with my bare hands if it wasn't for bungling them up again.' And he reached over in the corner and grabbed this gun by the barrel, and when he did I grabbed it by the stock and we scuffled over the gun, and the next thing I knew it went off. That is all I know."

W. J. Landis, a police officer of Oklahoma City, testified that he was off duty and going home when he

heard the shot at the Sunset Tavern. That he went to cabin No. 3 and, as he walked in the door, the defendant walked out. That he saw the deceased lying on the bed. That he asked Grindstaff if he was the one who shot the man and Grindstaff said he was. That the policeman then asked him where the gun was and defendant led him to cabin No. 12, "reached behind the door, and pulled out a .410 gauge, single-barrel shotgun, handed me the gun and told me that was the gun he had shot the man with."

Officer Vanscoy testified that he and Officer Peddicord made an investigation of the shooting shortly after it occurred. That they examined cabin No. 12. That the glass in the south door was broken from the inside toward the outside. That he talked to defendant about the shooting and defendant said that he and deceased got into an argument. That the deceased Young told the defendant that he wanted to take his girl friend out and he asked Young to leave three different times and Young did not do it. That Young told him to shut up or he was going to beat his head off, and he knew Young could do it because he had done it before to a man and that he was scared of him and, when Young hit him in the cabin, he grabbed the shotgun sitting behind the door and shot Young in the stomach right at the belt-line.

One Pierce testified that he lived in a trailer house about 10 or 15 feet from the cabin of the defendant. That shortly after he arrived home from work on July 22, 1943, he heard a noise that sounded like a chair or something falling and he looked over in defendant's cabin and saw Edith Roberts laying on the bed and she was saying to quit hitting her, to stop; that all she wanted to do was get out of there, and that defendant would

tell her to shut her mouth and, during the argument and fight, something went through the screen, but that he couldn't tell what it was. That Edith came out of the door and walked east and defendant came out, grabbed her by the arm, and pulled her back inside. That he could hear them arguing on the inside and he heard the deceased say, "As far as I am concerned, you are wrong, Frank." · That a short time later, Edith came out of the cabin and went east across the railroad track. That defendant came out of the cabin and called her back to the cabin. That a short while later, defendant came out to his car, opened up the trunk, and told the deceased there was his tools, and he could get them now. That the defendant Grindstaff went back into the cabin and just a short time after that, he heard a shot. That he jumped to his door and saw Edith come out of her door and say, "Oh, my God! He shot that boy!" That he went to the cabin where the deceased was and heard him calling for a doctor. That the argument in the cabin lasted about 30 minutes before the shot was fired. That he could not see the defendant in the cabin, but he could hear him cursing. That immediately after the shot was fired, he saw Edith run out of the door.

Mae Risch testified that she was the caretaker of the Sunset Cabins and was working there on the evening of July 22, 1943. That she knew the defendant and Joe Young. That she heard Edith Roberts scream about ten minutes before the shot, and went to the door and saw Edith and heard the defendant tell her to shut her mouth. That she heard the shot and went to her door just as the glass fell out of cabin No. 12. That Joe Young opened the door and came out. That she met him about halfway and took him to cabin No. 3, laid him on the bed, and called a doctor. That Edith came

running to the cabin shortly with Grindstaff running after her. That she said she was afraid of Grindstaff. She told Edith Roberts to go out the back door and she, the witness, would take care of Grindstaff. That Grindstaff sat down in a chair and said "they couldn't do nothing to me because he could have killed me with his fist if I hadn't have shot him." That Grindstaff went into the room where Joe was lying and commenced talking to him. That she heard Grindstaff say, "You know I had to kill you because you would have killed me if I hadn't," and Joe said, "Now, Frank, you know very well that I wouldn't hurt you."

Clyde Anderson, an officer in the Oklahoma City Detective Bureau, investigated the shooting after Young had been removed to the hospital. The glass was broken out of the window in the front door. Most of the glass from the window was on the outside of the cabin. Anderson testified that he returned to the police station and talked to the defendant. That defendant said he would not make a statement about the shooting until he had talked to Edith Roberts. That after the witness talked to Edith Roberts, he had another conversation with the defendant, during which he tried to get defendant to tell him the reason for the shooting, but defendant would not talk. That finally the witness asked defendant this question, "Are you jealous of Joe and Edith?" That when this question was asked, defendant became very angry, jumped to his feet and said, "What the hell do you think, by ——, he stayed down there with her the other night." The defendant said Young stayed at Edith Roberts' home at 700 S. W. 4th street, one night. That the defendant got mad when they continued to question him and finally said, "Well, he is dead, and I am alive, and I am not going to make any kind of a state-

ment until after I have talked to Edith and have an attorney." The officer further testified that the gun involved in the homicide could not be discharged without the hammer being first pulled back.

Joe Perkins, another policeman who investigated that case after Young had been taken to the hospital, testified that Grindstaff said that he had done the shooting because he was afraid of the man. That he examined the cabin where the shooting occurred that evening. That a thermos bottle was lying on the floor of the cabin on the north side of the cabin near the bed. That the screen at the window by the bed was torn loose and had a bulge in it.

P. L. Borden, another officer assigned to investigate the case, testified that the morning after the shooting, he talked to the defendant, but defendant said he did not want to make a statement until he had seen an attorney. That defendant asked several times if Joe Young was dead and that the witness told him Joe had died. That defendant told the officer, "that he had left the cabin after he and Joe had been arguing, due to Joe petting Edith Roberts on the back; he had become jealous of Joe's affections towards her and he had left the cabin and walked to the railroad tracks west of the cabins, about 150 feet. After he got to the railroad tracks he stopped and said he could not go ahead and leave that woman over there in the cabin with Joe, as he loved her too much, and he decided he would go back to the cabin, to which he did return." The witness further testified that defendant said he was sitting near the door when the deceased struck at him with an object in his hand and broke the door glass out of the front door. After deceased had struck at him with this

object, breaking the glass, the defendant reached behind the door and got the shotgun. That defendant said he was afraid of Joe Young because he had seen Joe beat a man into unconsciousness with his bare fists.

It is first contended that the court erred in submitting the issue of murder to the jury. In presenting this assignment of error, counsel for defendant rely solely upon the testimony of Edith Roberts and the defendant. It is true that the county attorney placed the witness Roberts upon the stand, but it does not follow that the jury was bound to believe everything that she testified concerning the homicide. It should be borne in mind that this woman and defendant had lived together as man and wife for many months before the homicide and that they had continued to see each other often after the death of Joe Young. There were other material facts testified by the policemen, the witness Pierce, and the caretaker, which contradicted some of the testimony of Edith Roberts, and which, when considered by the jury, together with all of the circumstances in the case, would have supported a verdict of guilty of murder.

Pierce, the next-door neighbor, testified that after he heard the shot, he ran to his door and then saw Edith Roberts come out of the door of the cabin where the homicide occurred, and say, "Oh, my God! he shot that boy!" This testimony concerning the conduct of the witness Roberts is contradictory to her statement that she ran out of the cabin before the shot was fired. Under the testimony of Edith Roberts, she ran out of the house, had gotten down off the steps when the shot was fired, and had run past two cabins before she turned around. According to her testimony, when she turned around, she saw defendant standing in front of the cabin and

a crowd had gathered. At that time, the deceased had already been moved to cabin No. 3. The physical facts strongly support Pierce's testimony that Edith Roberts was in the cabin and saw the defendant shoot the deceased. The county attorney was placed in the position to where he was forced to use the testimony of the witness Roberts, but it does not follow, because he placed this witness upon the stand, that the jury was bound to accept her testimony. They could disregard all or any part of it, and, where her testimony conflicted with that of other witnesses, the jury had a right to consider her association with the defendant as a factor which might have influenced her testimony.

22 O. S. 1941 § 745, provides:

"Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

Under this statute, unless the proof on the part of the state clearly shows that the crime committed only amounts to manslaughter, the court should submit the issue of murder and allow the jury, under proper instructions, to determine the issue of fact. In this connection, it is well to point out that mere words or threats, however opprobrious or violent, constitute in law no adequate provocation for passion such as will reduce a homicide from murder to manslaughter. In re Bollin, 3 Okla. Cr. 725, 109 P. 288.

If the state had nothing but the testimony of Edith Roberts, there would be considerable merit to the argument presented on behalf of the defendant, but there is

other testimony far more damaging than her testimony which, when considered with the physical facts, strongly sustains the charge of murder. At least, it is sufficient to require such issue to be submitted to the jury for their determination.

In addition to what is said above, it has been held that where the defendant was charged with and tried for murder and is convicted of manslaughter, objections urged to instructions given upon the question of murder will not be considered upon appeal, in the absence of a showing that defendant was injured thereby. Byars v. State, 7 Okla. Cr. 650, 126 P. 252; Duncan v. State, 11 Okla. Cr. 217, 144 P. 629; Elliott v. State, 18 Okla. Cr. 230, 194 P. 267; Littleton v. State, 19 Okla. Cr. 461, 200 P. 716, 717. There is no such showing herein made.

Counsel for the defendant relied chiefly for a reversal of this case on the contention that the trial court erred in failing to give certain requested instructions presented by counsel for defendant. These instructions were in different form, but all were based on the proposition that the deceased was a trespasser upon the premises of defendant and that the defendant had a right to defend himself and his premises against a trespasser who was unlawfully on his premises. Citing Collegenia v. State, 9 Okla. Cr. 425, 132 P. 375; Armstrong v. State, 11 Okla. Cr. 159, 143 P. 870.

The statute upon which the decisions relied upon by the defendant are based provides:

"Homicide is also justifiable when committed by any person in either of the following cases:

"1. When resisting any attempt to murder such person, or to commit any felony upon him, or *upon or in any dwelling house in which such person is.*" 21 O. S. 1941 § 733.

In this case, although there is testimony from both Edith Roberts and the defendant that defendant had told the deceased to go home, yet, such testimony alone would not justify the trial court in submitting the issue of justifiable homicide committed in the defense of a person's habitation. Assuming for the purpose of disposing of this contention that after the defendant told Joe Young to go home, he was a trespasser, it would not justify the home owner, under such circumstances, in taking his life. The law in this regard is well-stated in Jackson v. State, 49 Okla. Cr. 337, 293 P. 567, 568, as follows:

"A person may resist a trespass on real property in his possession, where such trespass does not amount to a felony, and may eject the trespasser therefrom by the use of any reasonable force short of taking or endangering human life; but if he is unable to prevent a trespass, where no felony is attempted, by any means short of taking or endangering human life, he must suffer the trespass and seek redress at the hands of the law rather than commit homicide." And see Garrison v. State, 19 Okla. Cr. 3, 197 P. 517.

In Dickinson v. State, 3 Okla. Cr. 151, 104 P. 923, 925, this court said:

"A mere trespass upon the land of another, even after the trespasser has been warned to depart and has refused, does not justify the landowner to use a dangerous or deadly weapon to resist the trespass. * * * The putting in use of a deadly weapon shows a wanton disregard of human life. Clark in his work on Criminal Law, at page 145, lays down the proposition in this terse and explicit language:

" 'A person may resist a trespass on his property, real or personal, not amounting to a felony, or removal or destruction of property not feloniously attempted, by the use of any reasonable force, short of taking or endangering life; but, if he is unable to prevent it, and

there is no felony attempted, he must suffer the trespass and the loss of property, and seek redress at the hands of the law, rather than commit homicide.' "

In the case of Marshall v. State, 11 Okla. Cr. 52, 142 P. 1046, syllabus 2, this court said:

"A landowner is not justified in making an assault upon another with a dangerous or deadly weapon in resisting a trespass on his premises, when no felony is attempted."

The trial court instructed the jury on the law of self-defense. Five instructions were given embodying in them the various theories of self-defense which the law allows to an accused. These instructions sufficiently covered all issues raised by the evidence. The law pertaining to defense against a trespasser becomes applicable where the accused contends that he was defending his domicile against an unlawful trespass. There was no contention in this case by the defendant that he took the life of the deceased because he was making an unlawful invasion of his home. In fact, under the defendant's own testimony, there was a denial that defendant took the life of the deceased, but the defendant's testimony was simply that the death of the deceased occurred through accident and misfortune while the defendant was attempting to wrest the gun from the hands of the deceased. The defendant denied discharging the weapon. The defendant testified that he was afraid of the deceased's ability to give him a beating with his bare fists but, at the time the shooting occurred, he did not contend that he shot the deceased in self-defense, but rather his testimony was in the nature of a denial that he shot the deceased at all, but that the gun was accidentally discharged while the defendant was committing the lawful act of attempting to take away from the deceased the gun which the ac-

cused said the deceased had grabbed from behind the door. In this connection, the court gave an instruction as follows:

"No. 19. The defendant contends that the deceased had grabbed the shotgun in question, and that he and the deceased were struggling for possession of same when said gun accidentally discharged and struck the deceased; that he did not know said gun was loaded, and that he had no intention of pointing or discharging said gun at the deceased, and that he did not point or discharge said gun at the deceased, and that said homicide is, therefore, excusable. In this connection you are instructed that if you find and believe from the evidence that the said Joseph Henry Young met his death by reason of accident and misfortune by the defendant, while he was doing a lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent, or you have a reasonable doubt thereof, then you are instructed that such homicide would be excusable, as heretofore defined in these instructions, and you must find the defendant not guilty."

In Smith et al. v. State, 22 Okla. Cr. 383, 212 P. 1012, it is stated:

"The trial court is not required to delve in the realms of conjecture or speculation in order to instruct upon some chimerical theory of the law of the case not reasonably supported by the evidence.

"When a defendant, who has the right of election as to several defenses, takes the stand as a witness and makes such admissions as to render every theory of defense unavailable save one, he will be deemed to have elected that one."

There are other requested instructions which we have carefully read and considered, together with the instructions given by the court, and our conclusion is that those given, considered as a whole, fully covered,

under the evidence, every phase of the case, and included all that was properly contained in those which were refused.

This case was well tried from the defendant's viewpoint. His counsel skillfully represented him at every step of the case. They have presented an able brief, thoroughly discussing many assignments of error in connection with the instructions given and refused. In some of the instructions, there might possibly be a word or two inserted which, when isolated from the balance of the instruction, could be subject to some criticism, but an appellate court cannot read the entire record, including the instructions which were given, without concluding that the trial was handled in an able manner by the trial judge. He gave the defendant the benefit of every right afforded him by our law. In fact, as we view the record, the trial court would have been justified in submitting to the jury the dying declaration made by the deceased, but, because strong objection was made to the admission of this statement and there was some evidence brought out on the cross-examination of one of the state's witnesses that the deceased, at the time he made the statement, might have had hope of recovery, the court refused to allow the admission of the dying declaration in evidence before the jury. The court could have had ample precedent for admitting this statement, in view of the fact that it was given just three or four hours before the death of the deceased and, especially in view of the testimony of the county attorney that the deceased made the statement to him after he advised deceased that his wounds were critical and that he probably would not recover. We do not refer to this in criticism of the court for refusing to admit the dying declaration in evidence, but to demonstrate the utmost fair-

46

ness with which the trial was conducted, and it is just one illustration to show that the defendant, in every stage of the proceedings, was given the benefit of any doubt that arose. If this dying declaration had been admitted in evidence, the state's case would have been greatly strengthened.

Human life is a precious thing and one who takes it may not escape just punishment for his act upon some finespun theory of defense which cannot be sustained by the physical facts.

Upon the whole record, we find no errors which would authorize this court to reverse the conviction. The punishment fixed by the jury is tempered by mercy, as the minimum punishment allowed by law is fixed as the term of imprisonment.

The judgment of the trial court is therefore affirmed.

BAREFOOT, J., concurs. DOYLE, J., not participating.