## WILLIAM F. TURPEN v. STATE.

No. A-11077. March 16, 1949.
(204 P. 2d 298.)

Ash & Bailey, of Cordell, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for defendant in error.

JONES, P. J.   The defendant, William F. Turpen, was charged by information filed in the district court of Washita county, with the crime of murder, the information alleging that on August 18, 1947, he shot and killed one Ted Garner.   Upon a trial to a jury, the defendant was found guilty but the jury being unable to agree on the punishment, the defendant was sentenced by the court to serve a term of 15 years' imprisonment in the State Penitentiary.

For a reversal of the judgment of conviction, it is contended that the trial court erred in refusing to give requested instructions numbered 3 and 4 of the defendant, and that under all the circumstances of the case, the punishment assessed by the court was excessive and should be reduced.

The defendant was a section foreman for the Frisco Railroad.   He had been working for the railroad for about 20 years and lived in the town of Rocky.   The deceased, Ted Garner, was 27 years of age, unmarried, also lived in Rocky, Okla., with his parents. He had just been recently discharged from the United States Army where he had seen four years' service.   While in the Army, the deceased taught boxing and was an instructor in judo for the purpose of training soldiers for combat duty. The evidence is also conclusive that before the deceased enlisted in the Army, he did some amateur boxing in and around the community where he resided.

Early in the evening of August 17, 1947, one Everett Smith, who also was a section hand working under the direction of defendant, came to the home of the defendant and invited him to go with Smith to the home of Shortly Warnke, who lived out in the country, to get some intoxicating drinks.   Smith and the defendant, Turpen,

drove to Warnke's home, but not finding him there, they started back to town and on the way met the deceased, Ted Garner, and Warnke. They all four returned to Warnke's house where they drank some whisky and a considerable amount of wine. About midnight, Turpen, the deceased, Garner, and Smith started home. They were all under the influence of the intoxicants which they had drunk and Smith especially appeared to be thoroughly inebriated.

According to the evidence of the state, when the parties arrived at the home of Smith, Smith got out of the door of the car and fell on the ground, and his wife came and helped him into the house. The defendant and deceased then proceeded on to the home of the defendant where they continued to drink some of the wine which they had brought with them from Warnke's.

The defendant swore that Smith and the deceased both got out of the automobile at Smith's house and that he drove on home. That shortly after he arrived at home, the deceased, Garner, appeared and entered his house, asking for a drink of wine.

The wife of defendant who testified on behalf of defendant, however, swore that the defendant and deceased entered their home together.

The wife of defendant brought them some ice from the refrigerator and defendant and deceased sat at a table in the kitchen and continued to drink more wine. The deceased according to the testimony of defendant was provocative and told his wife she was very good-looking and he couldn't understand how a good-looking woman like her had married a bum like the defendant. The defendant further testified that the deceased kept talking to his wife and would wink at her when deceased thought

defendant was not looking and that this aggravated him, but he knew that deceased was drunk so he did not say anything about it; that he finally insisted that deceased go home as it was time for them to go to bed and offered to drive the deceased home in defendant's car; that deceased said "No, I will walk", and struck the defendant across the table; that deceased started pulling his shirt off and said that he was going to pull the head off of defendant; that defendant's wife came in and talked to him and quieted him down; that defendant entered the kitchen and when deceased saw him, he again repeated that he was going to pull defendant's head off and throw it at him; that when he said that, defendant went into the front room and got his shotgun; that when he returned with the gun, the deceased said "shoot it you —— —— —— you haven't got the guts"; and deceased also said that he had a six-shooter at home and if the defendant would give him 10 minutes to go get it he would shoot it out with him; that the deceased had removed his shirt, but defendant's wife pitched his shirt to him and deceased walked out of the house; that defendant thought the deceased had gone and he walked out on the back porch, but that he saw the deceased come around the corner of the house and that he said to the defendant, "Come on out and fight like a man"; that an argument then ensued during which deceased said that if the defendant would let him have a cigarette, he would go home; that deceased then came back into the house and entered the kitchen; that his wife said "You are not going to come back in here," and deceased said "If you will give me my cigarettes, I will go"; that she turned around to get the cigarettes and deceased went on into the kitchen; that deceased then refused to leave, and when defendant entered the room with a

gun, the deceased cursed him and dared him to shoot; that deceased commenced to unbutton his shirt and made for defendant and defendant shot him.

The deceased was struck over the right eye by the charge from the shotgun, was killed instantly, and fell near the washstand in the kitchen.

. Immediately after the shooting occurred, the defendant and. his wife went to the home.of a neighbor and asked to be driven to Cordell. He told the neighbor that the deceased had drawn an ice-pick on him and struck at him with it and he shot and killed him; that defendant pointed to a scratched place where he said the ice-pick had struck him. The neighbors drove the defendant to Cordell where he was delivered to the officers.

The officers testified that the first time defendant talked to them he said that the deceased had struck at him with an ice-pick, but that after they had gone to the home of defendant to view the premises and to look at the deceased, they returned and told the defendant they could find no ice-pick close to the deceased, at which time the defendant told them he had made up the ice-pick story and that defendant didn't attempt to hit him with an ice-pick.

The officers further testified that they found the deceased slumped over the washstand with one arm in the sleeve of his shirt and the other out and that the pants pockets of deceased were turned inside out, which fact substantiated the theory of the state that the deceased was showing the defendant that he was unarmed and without a weapon at the time he was shot.

Requested instruction No. 3 of the defendants reads:

"You are instructed that in determining whether or not the defendant, as a reasonable man, in good faith,

believed at the time of the killing that he was in danger of suffering death or serious bodily injury at the hands of the deceased, you should take into consideration all the facts and circumstances that transpired at the home of the defendant just prior to and at the time of the killing, and also the defendant's knowledge of the deceased, and his reputation as a violent and dangerous man, or a *successful and experienced fighter."* (Emphasis ours.)

It is contended by counsel for defendant that it was important that the trial court insert into his instruction the underscored words in the above requested instruction for the reason that it was the personal knowledge of the defendant as to the trained boxing experience of the deceased that caused the defendant to have the fear of the deceased that he had on the occasion when he took his life.

It is well settled that the defendant is entitled to an affirmative instruction embracing his theory of the defense. Skelley v. State, 64 Okla. Cr. 112, 77 P. 2d 1162.

The trial court gave five separate instructions on the law of self-defense. Each of these instructions was a correct general statement of the law pertaining to the issue of self-defense. We quote a part of them as illustrative of the court's interpretation of the law:

"You are instructed that in considering the question of the innocence, or guilt of the defendant, you are to take into consideration all of the facts and circumstances, surrounding the scene of the killing, and view the same from the standpoint of the defendant as they actually appeared to him at the time and immediately preceding the firing of the shot; and if you find from such evidence, facts, and circumstances that the defendant as a reasonable man honestly believed that it was necessary to take the life of the deceased, to protect the defendant from losing his life, or from suffering great bodily injury, it will be your duty to find the defendant not guilty.

"While a person need not be in actual imminent peril of his life being taken, or of great personal injury being done him, yet if the jury believes that the defendant had reasonable grounds to believe and did believe, from the facts as they reasonably appeared to him at the time, that the danger was so urgent and pressing, that the defendant could not avoid the necessity of firing the shots that killed the deceased, in safety to himself to protect himself from death or great personal injury, then, if under such circumstances the killing took place, it was justifiable.

"You are further instructed that while one unlawfully attacked has the right to use such force as under the circumstances reasonably appears to him to be necessary to repel the attack and avoid injury to himself, yet he will not be justified in using greater force than reasonably appears necessary and sufficient to avoid the danger, or apparent danger, and thereby kills the person who made the attack, and it so appeared to him when he killed the person making the attack, he will be guilty of manslaughter in the first degree; and in determining the question as to whether or not the defendant was in danger, or apparent danger, under these instructions, you are told that the law requires you to view the circumstances at the time from the defendant's standpoint as they reasonably appeared to him."

It is our conclusion that it was not necessary for the court to specifically call attention to the jury in the instructions to the alleged knowledge of the defendant that deceased was a successful and experienced fighter. This was a matter that counsel for the defendant argued to the jury and rightly so under his theory to show the state of mind of defendant and to sustain his argument that deceased was the aggressor in the fatal difficulty. A large number of the witnesses at some place or other in their testimony mentioned the fact that the deceased was an able boxer and this fact no doubt was taken into

consideration by the jury when they undertook to view the facts and circumstances surrounding the killing as they reasonably appeared to the defendant at such time. It is not proper for the court to comment upon or stress particular evidence of either the state or defendant and in this case, if the disputed words in the above instruction had been given, it would have been a comment by the court on the evidence.

In the case of Sherman v. State, 20 Okla. Cr. 306, 202 P. 521, 523, it is stated:

"It is urged also that the court erred in refusing to in some manner instruct the jury in substance as stated in the concluding language of defendant's requested instruction No. 5, which was refused by the court, namely:

"'You have the right, in this connection, to consider the relative strength, weight and physical condition of the deceased and the defendant at the time of the homicide.'

"There was no error in the failure of the court to give such a specific instruction. The testimony is undisputed that there was a marked difference between the strength, weight, and physical condition of the defendant and the deceased, and this testimony raised an issue of fact for the jury, and was doubtless considered by them, along with all the other circumstances in the case. The court did instruct the jury fully and fairly upon the right of the defendant to defend himself against death or serious bodily harm, real or apparent, as appeared from the evidence. The accused, as a matter of right, may not demand an instruction touching upon every feature of the evidence in all of its details, not involving issues of law. Indeed, the court should abstain from giving an instruction that might be construed as a comment upon the weight or importance of any particular evidence. Roddie v. State [19 Okla. Cr. 63], 198 P. 342."

The various instructions that were given in the instant case in regard to the law of self defense were correct state-

ments of the law, and we do not feel that the court erred in refusing to emphasize in the instructions the knowledge of defendant as to the success and experience which the deceased had enjoyed as an instructor in boxing.

Requested instruction No. 4 of the defendant reads:

"You are instructed that the defendant, at the time of the killing of deceased, was in his own home, where he had a right to be. If you find that the deceased, Ted Garner, went to the home of the defendant uninvited, or that having been invited therein by defendant, that he thereafter made hostile threats or demonstrations toward the defendant, the deceased would be, in either such event a trespasser, and defendant would have the right to defend himself and use all force necessary to resist further invasion of his home by deceased."

The facts are disputed as to whether the deceased was a trespasser in the home of the defendant. Assuming that he was a trespasser, then just what duty, if any, was owed by the defendant to the deceased.

In the recent case of Grindstaff v. State, 82 Okla. Cr. 31, 165 P. 2d 846, 851, this court had occasion to discuss at length the question as to justifiable homicide committed where the deceased was an alleged trespasser. It was there stated:

"There was no contention in this case by the defendant that he took the life of the deceased because he was making an unlawful invasion of his home. * * * The law pertaining to defense against a trespasser becomes applicable where the accused contends that he was defending his domicile against an unlawful trespass. * * *

"Assuming for the purpose of disposing of this contention that after the defendant told Joe Young to go home that he was a trespasser, it would not justify the

home owner, under such circumstances, in taking his life. The law in this regard is well stated in Jackson v. State, 49 Okla. Cr. 337, 293 P. 567, 568, as follows:

" 'A person may resist a trespass on real property in his possession, where such trespass does not amount to a felony, and may eject the trespasser therefrom by the use of any reasonable force short of taking or endangering human life; but if he is unable to prevent a trespass, where no felony is attempted, by any means short of taking or endangering human life, he must suffer the trespass and seek redress at the hands of the law rather than commit homicide.' And see Garrison v. State, 19 Okla. Cr. 3, 197 P. 517.

"In Dickinson v. State, 3 Okla. Cr. 151, 104 P. 923, 925, this court said:

" 'A mere trespass upon the land of another, even after the trespasser has been warned to depart and has refused, does not justify the landowner to use a dangerous or deadly weapon to resist the trespass. * * * The putting in use of a deadly weapon shows a wanton disregard of human life. Clark in his work on Criminal Law, at page 145, lays down the proposition in this terse and explicit language:

" ' "A person may resist a trespass on his property, real or personal, not amounting to a felony, or removal or destruction of property not feloniously attempted, by the use of any reasonable force, short of taking or endangering life; but, if he is unable to prevent it, and there is no felony attempted, he must suffer the trespass and the loss of property, and seek redress at the hands of the law, rather than commit homicide." '

"In the case of Marshall v. State, 11 Okla. Cr. 52, 142 P. 1046, syllabus 2, this court said:

" 'A landowner is not justified in making an assault upon another with a dangerous or deadly weapon in resisting a trespass on his premises, when no felony is attempted.' "

Another recent case is Hovis v. State, 83 Okla. Cr. 299, 176 P. 2d 833, in which the second syllabus reads:

"Proprietor of beer tavern is not justified in killing another with a deadly weapon in resisting a trespass on his premises when no felony is attempted."

The language of this court in disposing of that case could very well be used in disposing of the instant case. It was there stated:

"The deceased and Martin were certainly acting improperly at the defendant's tavern. Their words and general conduct were very provocative. The defendant was authorized to evict them from his premises. Under the state's evidence, the deceased was doing no more than uttering abusive language and threatening to fight when slain. He and his companion were both unarmed. According to the state's evidence, the deceased had returned to the tavern to secure a cap which he had left. Human life is a precious thing. Once taken, it cannot be restored. It appears to us that the jury acted in a reasonable manner when they concluded that the defendant was not justified in taking the life of the deceased to prevent a threatened breach of the peace or trespass on his premises."

The defendant and deceased were both under the influence of intoxicating liquor. Had either of them been sober, the tragedy probably would not have occurred. As to what the deceased said while in the home of the the defendant, we have only the word of the defendant and his wife. The defendant said that deceased drew himself up in the pose of a fighter and offered to pull off defendant's head.

The deceased did not have so much as a pocket knife in his pockets. The physical facts show that the deceased was 10 or 20 feet away from the defendant at the time the fatal shot was fired. There was no justification for the taking of the life of the deceased. The de-

fendant, if he thought it was necessary to shoot the deceased, could have wounded him, but instead he chose to shoot him directly in the head, blowing out the brains of the deceased on the floor and causing instant death.

In this case there was no contention in the evidence of defendant that he was defending his home from invasion nor to prevent a felony from being committed against it. The requested instruction contains only a partially correct statement of the law. It would have been proper for the court to have told the jury that the killing occurred in defendant's home where defendant had a right to be, and that if the deceased remained in his home after being ordered to leave he became a trespasser, and that a person in possession of real property has the lawful right to eject a trespasser by the use of any reasonable force short of taking or endangering human life; but if he is unable to prevent a trespass, where no felony is attempted, by any means short of taking human life, he must suffer the trespass and seek redress at the hands of the law rather than commit homicide.

The court did not err in refusing to give the requested instruction and did not commit fundamental error in failing to give an instruction on the theory that deceased was a trespasser. The testimony of defendant did not raise an issue of defense of home or of his wife or to repel a threatened or continued invasion of the home, but his defense rested solely on his claim that deceased was about to commit a felony on defendant's person by assaulting defendant and that he was put in fear of his life. This theory of defense was amply covered by the instructions which were given.

The arguments of the assistant county attorney and county attorney are reported in full. We have exam-

ined them and do not find any improper argument. Great latitude should be given to both counsel for the state and defendant and a wide freedom of expression is authorized in presenting their arguments. However, if counsel for the state exceed the bounds of propriety and attempt to resort to prejudicial statements to secure a conviction, this Court will not hesitate to set aside a conviction because of such tactics. However, nothing of that sort is found in this record.

Contention is also made as to the error of the court in admonishing counsel for defendant "to not lead the witness". This statement of the court occurred while counsel for the defendant was cross-examining one of the state's witnesses and, of course, counsel had a perfect right under such circumstances to lead the witness. The court was evidently confused at the time he made the statement as to who had placed the witness on the stand, but this matter is so insignificant and immaterial that it had no bearing on the outcome of the case. This is just a case where the defendant exceeded the bounds of the law in taking the life of the deceased. We do not feel that the punishment assessed under the circumstances was excessive.

The judgment and sentence of the district court of Washita county is affirmed.

BAREFOOT and BRETT, JJ., concur.