Marchmont MILES, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12658.

Criminal Court of Appeals of Oklahoma.

March 4, 1959.

Shoemake & Briggs, Pawhuska, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Marchmont Miles, plaintiff in error, hereinafter referred to as defendant, was charged in the district court of Osage County with the crime of felonious assault and battery with a dangerous weapon; was tried before a jury, convicted and punishment assessed at confinement in the county jail for a period of six months, and has appealed.

For reversal of the conviction a number of errors are set forth in petition in error, and are argued in brief without compliance with the rules of this Court requiring arguments to be presented under headings of definite specifications of error, or propositions. Nevertheless, we have read and re-read the briefs and the record.

The information charges in substance that defendant, while driving a 1957 Ford convertible automobile in a dangerous and reckless manner, and while under the influence of intoxicating liquor, to-wit:

"on United States Highway No. 60, at a point approximately 9 miles northeast of Pawhuska, Oklahoma, in that said defendant was driving said automobile in a westerly direction along said highway at a dangerous and excessive rate of speed, to-wit: of the approximate speed of 85 to 90 miles per hour in the night time of said day, causing said automobile to swerve over and across the center line of said highway into the travel lane on the

south side of said highway, and then back across the center line of said highway on the north side thereof, and causing said automobile to leave the travel portion of said highway into a drain ditch on the north side of said highway, causing said automobile to overturn several times and wrecking and demolishing said automobile, laying down approximately 635 feet of skid marks in the doing thereof, at which time and during which time the said Carmen Smith was then and there a passenger in, and riding in the said Ford automobile and the said Carmen Smith was violently thrown from her seat in said Ford Automobile by reason of the manner said automobile was being driven by the said Marchmont Miles at the time, crushing, cutting and bruising the body of the said Carmen Smith, and causing her to suffer severe and extremely personal bodily injuries, which injuries were of such nature as likely to produce great bodily harm and injury or death; all being sustained by reason of the acts and doings of the said defendant, as aforesaid, with the unlawful and felonious intent, then and there on the part of him, the said defendant, Marchmont Miles, to injure the said Carmen Smith and do her great bodily harm and injury * * *."

■ It is further argued that defendant was entitled to a mistrial because of the circumstance that while the first witness for the State, Rebecca Harris, was testifying she was in a wheel chair, and the county attorney asked her if she was in a wheel chair prior to the date upon which the offense occurred, to which the witness, over objection, replied in the negative. The county attorney then inquired, "Are you crippled at this time?" and witness answered, "yes." No objection to the question was interposed, but counsel for the defendant objected after the answer had been given and made a motion for mistrial. The court instructed the jury not to consider this testimony, but counsel contends that

the harm had already been done. However, the jury could see that the witness Rebecca Harris was injured. She was a necessary witness who had been in the car the defendant was driving at the time of the wreck. In fact, she was the owner of the car, but had picked defendant up and gotten him to drive her and Carmen Smith around Pawhuska, and then out to a nearby lake. Then, too, the testimony of the various witnesses, including the defendant himself showed that at the time of the accident Rebecca Harris was not crippled, but was fully able to travel about on her feet and drive her automobile, which the defendant was driving at the time of the accident because Rebecca and Carmen were both, according to their testimony, intoxicated. We find no error under the facts as reflected in the record.

■ Defendant complains of his cross-examination by the county attorney, alleging the same to have been improper and prejudicial. It appears by the record that the county attorney questioned the defendant as to whether or not he had been, for a long time, addicted to the use of alcoholic liquors. We note that the court sustained an objection to this question and instructed the jury not to consider the matter. Not only that, but the record discloses numerous instances in which the defendant had been convicted or plead guilty of drunkenness and driving while under the influence of intoxicating liquor. So, as contended by the Attorney General, the question asked by the county attorney called for an answer that amounted to a mere summary of that which had already been fully proven and admitted. The admonition of the trial court, we feel, in this case fully protected the defendant, and the error of the county attorney will be treated as harmless.

■ It is finally contended that the instructions given by the court failed to present to the jury the defendant's theory of defense, and that by refusing to give the defendant's requested instruction covering his theory of defense, the court denied to the defendant the right to have his defense

presented to the jury for their consideration. This proposition has given us much concern and we have read and re-read the record to be certain whether or not there was basis in the evidence that would entitle defendant to an instruction of the nature contended for.

It was the argument of counsel for the defendant that defendant was not intoxicated, and he introduced evidence to support such theory. This requires that pertinent evidence be summarized. The State presented evidence to the contrary, which was sufficient to support the judgment, except for another factor. Counsel in his opening statement not only contended that defendant was not intoxicated, and in due course presented evidence in support thereof in spite of certain admissions by defendant, but contended that defendant had lost sleep and that he momentarily dozed at the wheel of his car with the result that it went out of control and down a bank into a creek. There was evidence by defendant that he was employed on the night shift at an oil rig. There was no evidence of the exact night when he last worked. It might be presumed from defendant's statements that he had worked the night of July 3, 1957.

Specifically, defendant testified that he lived 10 miles west of Pawhuska, and had all his life. He admitted that he had visited his neighbor, Charley Whitehorn, about 2 o'clock in the afternoon of July 4, 1957, going there by car, and staying until about 6:30 or 7 P.M. He said that during this time a pint bottle of whiskey was passed around; that there were five persons present who consumed the pint, and that he took three or four drinks. He said that he had previously worked from 11 o'clock at night until morning and was tired (he did not specify the last night that he had worked), and that Jack Couch drove defendant, Mary Wilson, Carmen Smith and Kenneth Glenn, Jr. to Pawhuska and let Carmen and Kenneth out near Brown's Cafe. He said that after this he, Couch and Mary Wilson rode around town two or three times and went back out to Charley's and Julia's (Whitehorn). He said they stayed at Whitehorn's

about thirty or forty minutes. He denied that there was any drinking on the second trip except Mrs. Whitehorn drank a can of beer. After this Jack Couch drove him towards his home. Mary Wilson was with them. He said that about 150 yards from his home he met Carmen Smith who was then in a car being driven by Rebecca Harris; that the car was a practically new Ford convertible and belonged to Rebecca, and that she wanted defendant to drive them around. He told her he was tired and sleepy and they argued about him having been out with another girl, but he finally agreed to go with them and drove the girls to Pawhuska; that they stopped at Brown's Cafe, and got a check cashed at Bob Keele's Recreation Place; that they drove through town a time or two and then drove to Sunset Lake. They stopped on the way at Midway Service Station to let the motor cool, and to put water in the radiator; that Rebecca drove on two or three miles on a country road to the lake. They made a stop to put the car top down. He said that about this time another car came along containing Freddie Spotted Bear, Rita Hill and E. W. Carr. They talked about five minutes, and all proceeded to the lake where the cars were parked close together and they all talked. Neither defendant nor Rebecca got out of the car. He did not see anyone drink except he saw Carmen Smith with a can of beer in her hand. He said that he and Rebecca argued and then they sat quiet, relaxed and he went to sleep. He thinks he slept about an hour and then the people in the other car got ready to leave and he was awakened, and let the other car get ahead for ten to fifteen minutes as the road to the highway was very crooked and dusty. That he then proceeded to drive at a speed of about 35 miles an hour up to the highway, where he turned to the right on the way to Pawhuska. He said that Carmen and Rebecca were in the car with him and both had passed out. He stated that they had been drinking liquor somewhere prior to picking him up. As to the facts of the accident, defendant testified:

"A. Well I was driving down the road, and I evidently dozed off and when I awoke why I looked at the road and I was on the left hand side of the middle line, the dividing line of the highway, and it scared me for being asleep at the wheel, and when I woke up I jerked the wheel to get it back on my side of the road, and I lost control of it in that attempt to do that.

"Q. Now, how far down the highway then did it go while you were trying to gain control of the car? A. Well, it didn't go too far. When I jerked it back it kinda was skidding there along, and then it went off of the road on the right hand side.

"Q. All right. Now what happened to you whenever it went off on the right hand side of the road? A. Well, it seemed like it was going to do all right it looked like for a minute and—well, I guess it was just a fraction of a second, and then it done something else and started to turn over, and when it did why that was the last I remember."

Witness further testified that he was thrown from the car and knocked unconscious and when he came to there were other persons walking around, including a highway patrolman. He said that he heard Carmen screaming and went over to comfort her and then the highway patrolman ordered him to go get into the highway patrol car, which he did and that while they were waiting he went to sleep and then was taken to the jail at Pawhuska and booked. He said that he was bruised all over and that his head constantly bothered him. He said that he did everything he could to avoid running off the road.

The State's witness Freddy Spotted Bear had testified that he drove to Sunset Lake the evening of July 4, around 10 or 11 o'clock and on the dirt road saw the defendant getting in a Ford convertible and that he stopped beside the car and some conversation took place, and then defendant drove on to the lake, and that witness parked his car near and all the parties visited for about forty-five minutes. Witness denied that he saw defendant drink at the lake, and said that he did not show any sign of having taken a drink. He did not talk to him there, or know whether he ever got out of the car or not.

Rebecca Harris testifying for the State said that when she picked defendant up the afternoon of July 4 she could tell that he had been drinking. She denied that he got out of the car when they drove to Sunset Lake. She said that defendant wanted to go home, said he was tired. She said that she cautioned defendant to slow down as they drove along the dirt road but that thereafter she did not remember anything that happened. When she next came to she was in the hospital.

Carmen Smith testified for the State, and said that early the morning of July 4, 1957 she, Mary Wilson and Kenneth Glenn went to defendant's home out in the country from Pawhuska. She denied that they stayed around there all morning, but said that they went over to the home of a neighbor of defendant, Whitehorn's, and spent the day drinking whiskey, and that they drank more than one bottle, and that defendant drank off and on during the day. This was in contrast to defendant's testimony that they did not go to Whitehorn's until 2 P.M., and did not drink over one pint of whiskey. All parties agreed that they stayed at Whitehorn's until 6:30 or 7 P.M., when Jack Couch drove to Pawhuska. Carmen Smith got out in town.

Carmen Smith further testified that out at Sunset Lake both she and Rebecca were under the influence of intoxicants; that no one drank after they got in Rebecca's car, but she thought defendant was under the influence. She remembered defendant backing out at the lake to return to Pawhuska, and then she passed out and the next thing she remembered was the next day when she became conscious in a hospital.

Emil Hunt, highway patrolman for 17 years, testified that accompanied by patrolman Darrell VanHorn, around 12:20 the morning of July 5, 1957 he investigated a car wreck on U. S. Highway 60 between Pawhuska and Bartlesville; that the first thing he observed on arriving at the scene was an automobile down in a creek bed about a hundred feet from the highway; that there was a woman partially under the car and one lying up on the bank and the driver (this defendant) was there walking around; that he could smell alcohol on defendant's breath and that defendant in his opinion was intoxicated; that he directed him to get into the patrol car, which he did, and soon was asleep. Witness said that he made measurements of skid marks on the asphalt pavement; that the skid marks commenced on the left side of the road and measured 300 feet to the point where the car ran off the road on the right hand side, and 335 feet on to where the car stopped; that the pavement was dry. He said that he found seven empty beer cans in the automobile and three full cans. From the skid marks he estimated the speed of the car at from 80 to 85 miles per hour prior to the wreck. The car was demolished. An ambulance took the two women to the hospital and witness took defendant to the county jail. He said that defendant could not remember his birth date, and was unable to give his name.

Patrolman VanHorn said that when they arrived at the scene he went to see the woman who was partially under the automobile and who was screaming; that defendant held her hand; that there was a second woman on the ground; that he later learned these persons to be Carmen Smith and Rebecca Harris; that the ambulance soon arrived and took the women to the hospital. Witness said that defendant staggered around and bumped into people and that he smelled of alcohol and was "just talking to everybody". It was the opinion of witness that defendant was intoxicated.

Deputy sheriff Gordon Hughes went to the scene of the wreck. He saw defendant in the patrol car with his eyes closed. He talked with him in the county jail the next morning and told him about the two women being injured and that one was in real bad condition. He said that defendant acted as if witness were "kidding" him and appeared not to believe what witness told him. His testimony verified that of the other officers as to it appearing that the car had turned over several times after leaving the road.

The defendant requested the court to give the following instruction:

"You are instructed that the defendant has introduced evidence showing that on the date and time of the accident he was proceeding on the highway in a careful and prudent manner and was not under the influence of intoxicating liquor. That as he drove west on Highway No. 60 at the point of the accident he was tired and went to sleep for a moment. That when he aroused he discovered that he was over the center line of the highway and attempted to turn the car back into the right lane and lost control of the automobile. That the accused attempted to avoid the accident and did everything that he could do to bring the car under control. That it left the highway and turned over, causing the injury of Carmen Smith. You are instructed in this regard, if you find the above facts to be true, or if you have a reasonable doubt thereof, it will be your duty and you are instructed to find the defendant not guilty."

Defendant cites the case of Crossett v. State, 96 Okl.Cr. 209, 252 P.2d 150; Turpen v. State, 89 Okl.Cr. 6, 204 P.2d 298, and Tillman v. State, 82 Okl.Cr. 276, 169 P.2d 223, as being conclusive of his right to have received an instruction based on his theory that he was not under the influence of intoxicating liquor but was tired from the loss of sleep and momentarily dozed.

The cases cited are authority for the rule that an accused is entitled to an affirmative instruction embracing his theory of the case, and based on the hypothesis that his testimony and the testimony of his witnesses was true, when the testimony affects a material issue in the case.

In the Crossett case, supra, urged as decisive in this case, defendant produced evidence that he had passed a vehicle immediately prior to the accident there involved, and therefore had a right to be on the left center of the highway in so doing, and the court wholly ignored the requested instructions of the defendant defining the rules of the road under such facts. The facts in the Crossett case clearly distinguish it from the facts in the within case.

■■ Here defendant admitted that he had taken three or four drinks of whiskey in the afternoon prior to the accident, and he was to such extent under the influence of intoxicating liquor, depending on the size of drinks. But more than this, he admitted that when he came to on U. S. Highway 60 he was driving at between 50 and 60 miles per hour on the wrong side of the road, which amounted to culpable negligence in the operation of the vehicle, regardless of whether such was caused from intoxication or from loss of sleep. By 47 O.S. § 121.3, it is unlawful to drive a motor vehicle on the highway of Oklahoma in the night time at a speed greater than 55 miles per hour.

■ In the within case the sole disputed question for the jury was whether defendant was under the influence of intoxicants. The court by its instructions fairly submitted the issue. In Potter v. State, Okl.Cr., 266 P.2d 647, this Court said:

"Where the instructions given by the trial court fully and fairly cover the issues of the case, it is not error for the court to refuse to give the defendant's requested instructions."

■ There was ample evidence to support the verdict and judgment. The jury could have assessed punishment up to five years in the penitentiary. 21 O.S.1951 § 645; Boyd v. State, 97 Okl.Cr. 331, 263 P.2d 202; Beck v. State, 73 Okl.Cr. 229, 119 P.2d 865. They assessed only six months in the county jail.

Judgment affirmed.

NIX and BRETT, JJ., concur.