## ELLIE PIERSON v. STATE.

No. A-1973.   Opinion Filed May 19, 1917.

(164 Pac. 1005.)

TRIAL—Instruction—Circumstantial Evidence.   When the state's case is based wholly upon circumstantial evidence, and the proof offered by the defendant discloses only facts which tend to exonerate him from the commission of the crime charged, an instruction on circumsttntial evidence should be given by the court, and it is error to refuse to do so when it is requested.

*Error from District Court, McCurtain County;*
*Summers Hardy, Judge.*

Ellie Pierson was tried upon a charge of murder, convicted of manslaughter, and he brings error. Reversed.

*Ames, Chambers, Lowe & Richardson* and *T. J. Barnes,* for plaintiff in error.

*G. M. Barrett,* Co. Atty., for the State.

The Attorney General and *G. M. Barrett,* Co. Atty., for the State.

ARMSTRONG, J.   The plaintiff in error, Ellie Pierson, was indicted by the grand jury of McCurtain county in 1912, jointly with one John Flanagan, for the murder of S. B. Lyons, a negro, in April of that year. Flanagan was never apprehended. The plaintiff in error was tried in December, 1912, convicted of manslaughter in the first degree, and his punishment fixed at confinement in the state penitentiary for a term of four years.

An elaborate statement of facts, as they were developed at the trial, is presented in the brief of the plaintiff in error, the correctness of which is not challenged by counsel for the state. We therefore adopt the same for the purposes of this opinion:

"George Lyons testified on behalf of the state as follows: 'I am 15 years of age, and a son of the deceased. In the spring of 1912 the deceased was working at Broken Bow. On the Saturday night of the killing, defendant and a tall fellow, neither of whom I had ever seen before, came to deceased's camp. They came in, and defendant sat leaning against the bed, and the tall fellow went outside with deceased and talked to him. They came back into the tent and got deceased's hat, and the tall fellow said that he had three cases of whiskey at the log camp, and he wanted deceased to go with them and help bring it to the camp where deceased stayed. As they started out deceased turned around and said, "Boys, I will be back after while." We sat up and waited for him, but he did not come back, and we went to bed and to sleep. I next saw deceased on the following Monday. He was in the branch by the side of the railroad, dead. His throat was cut. Deceased was not drinking any that night. I do not know whether deceased bought anything from the two men that night or not. Deceased had about $50, but this was subsequently found under his pillow.'

"Cross-examination: 'It was the "tall fellow" who took deceased outside, and at no time did the defendant say anything.'

"S. L. Brock testified in behalf of the state: 'I was not personally acquainted with the defendant, but had seen him several times. Deceased lived in the camp. I saw deceased after he was killed, close to the railroad about a quarter of a mile from where the latter lived. His throat was cut. I saw defendant and another fellow on Saturday evening before the killing about three miles out of Broken Bow going towards the front. Deceased lived at the front in a tent.'

"H. L. Stiff testified in behalf of the state: 'I was a constable and lived near Broken Bow. I did not see the deceased. I followed the defendant and Flanagan from Broken Bow to John Beavers' house, where they spent the night; learned there that they had gone to Hochatown.

At Hochatown I found that they had gone to Grannis, Ark. Defendant's mother lived at Grannis; I went to Grannis and had a deputy sheriff there arrest defendant. I asked defendant where Flanagan was, and the latter replied that he didn't know; guessed he was in Louisiana by that time, as he left that morning on the train. A little later defendant said that Flanagan was over at Frank Arnold's, his brother-in-law. I went to Frank Arnold's, and the latter said that Flanagan had been gone 30 minutes. Defendant made a statement to me in regard to the killing. He said they were down there in the pole camps; that Flanagan sold the deceased some whiskey, and when the latter got his pocketbook out to pay for it, Flanagan saw he had some money, about $17, and when it got dark Flanagan decided to get deceased out and relieve him of that money. So he decoyed him off to carry some whiskey he had hid and got him out and searched him, and found that deceased didn't have any money, and Flanagan got mad and beat him around there awhile, and defendant heard the negro struggling, and said to Flanagan, "Don't kill him!" and Flanagan said, "I have done killed the son of a bitch now"; that Flanagan threw the body in the branch; that they went to Broken Bow, from there to Bob Beavers', thence to John Beavers', from there to Hochatown, and thence to Arkansas.'

"Cross-examination: 'Defendant never stated that he had anything to do with the killing, but said that the other fellow did it. He never said that he had taken any part in decoying the negro off or in killing him. He said he was sitting on the spur a few feet away from Flanagan. He said that Flanagan threw him in the branch. Defendant voluntarily returned with me from Arkansas.'

"Here the state rested, whereupon the defendant introduced the following evidence:

"R. L. Beavers, Jr., testified on direct examination: 'I know the defendant, and have seen Flanagan. Some time during the night in which Lyons was killed Flanagan and defendant came to my house and knocked on the

door and I got up and let them in.'   The defendant at this time offers to prove by the witness that on the night of the killing, between 9 and 11 o'clock, the defendant, with the said John Flanagan, came to the witness' house with the said John Flanagan, and there in the presence and hearing of the defendant stated to the witness that he didn't care to sleep any that night; that he had killed a negro down on the front, and was leaving the State of Oklahoma; that the defendant had to go with him; that the defendant took no part whatever in the killing, and defendant in no way was responsible for the killing. (State objects.   Objection sustained, to which defendant excepts.)   I had no talk with defendant that night, but the next morning, when Flanagan stepped into another room to comb, defendant said, "Well, you heard what we had to say last night, and it is true; I want you to get the officers as quick as possible and follow us; I will try to get him to go to Bob's tonight, and you go there; and if I don't and go on to Arkansas, you will find him there."   I was unable to find Mr. Stiff, who was an officer, but I told Mr. Byrd, the city marshal, about it, and he got Mr. Stiff; and Stiff, Mr. Gravis, the night marshal of Broken Bow, myself, and another man went to my father's on the request of the defendant to follow them there.   We did not find them there.   The other men went to Hochatown, and Stiff and I went on to Arkansas.   We found the defendant at Granis, Ark., but did not find Flanagan.'

"Cross-examination:   'I told Mr. Byrd about it either the next day or the day following.   He was the only one I had told.   I told him before I heard of any reward being offered.   I had heard nothing of the killing except what Flanagan and the defendant told me at my house.   We found the defendant at my uncle's about two miles from Grannis Willis Hungate brought him there.   We were looking for Flanagan.   I had known the defendant about all my life.   That was the first time he had stayed at my house since I was married.   I had known Flanagan about a month or six weeks.'

13 O C R—13

"Redirect examination: 'I went with the officers to try to catch Flanagan, and the defendant went with us. Defendant told Mr. Stiff that he had better hurry up, as Flanagan might get word of their presence. When we got pretty close to the house Mr. Stiff told the defendant it would be best for the latter to go in the house and get Flanagan out, if he could, and we would waylay him and arrest him. The defendant went in the direction of the house. We couldn't see the house from where we were. The rest of us stayed together. Flanagan was gone. The night when Flanagan came to my house he was wet. He threw away his socks at my house. He had a blood stain on his shirt front.'

"Recross-examination: 'After the defendant came back, we went on up to the house. We were not more than 25 or 40 steps from the house when the defendant went up to it, but the house was in the woods.'

"John Beavers testified in behalf of the defendant as follows: 'I live about ten miles from Broken Bow. I know Ellie Pierson. I was introduced by him to a man named Flanagan, sometimes called Johnson. This was about the time the negro Lyons was killed. Flanagan, or Johnson, had on an undershirt and a coat. He had no overshirt and no socks. I gave him a shirt and a pair of socks.'

"Johnnie Beavers testified in behalf of the defendant as follows: 'I live at Grannis, Ark. Know the defendant. Was introduced by him or my uncle to a man named Johnson about the time the negro Lyons was said to have been killed. This was at my uncle, John Beavers', house. I was out hunting, and when I got in that evening they were there.. They said they stayed at Bob Beavers the night before. They stayed at Uncle John's that night. I tried to have a private talk with the defendant, but when we started anything the other fellow always went with us. I had no opportunity to talk to him privately until the next evening. He told me then that if the officers came to Uncle Bob's to tell them to be at Hochatown

that evening, and to tell them to come on, and if they were not there, to come on to Grannis, Ark.; that he was going on home, and he expected them to be at Uncle Bob's when he got back.'

"Cross-examination: 'I had known the defendant about all my life. Never met Flanagan until that evening. Defendant is not related to the Beavers family in any way.'

"R. L. Beavers, Sr., testified in behalf of the defendant as follows: 'I live at Grannis. I know the defendant, and remember the time he was arrested. The defendant said he wanted the officers to be certain to catch Flanagan if he assisted them; that he was afraid for his life, and would do all he could. He said for them to hurry on up there. I didn't go. Mr. Stiff, Bob Beavers, Mr. Hungate, and the defendant went.'

"Tom Fulson testified in behalf of the defendant as follows: 'I live at Idabel, and work at Broken Bow; know S. B. Lyons and have seen defendant. I saw Flanagan, Johnson, or Burk, as they called him, at Adams' stave camp on the night of the killing. My tent and Lyons' tent were close together. About sundown on the evening of the killing this man, known as Burk, was at Lyons' tent. I saw him sell Lyons a pint of whiskey. The defendant was not there. Lyons and I bought a pint between us, each paying half. Lyons had $20.20, and three coppers. He pulled his money out, and this fellow that sold the whiskey said, "I will show you how the boys count this greenback." He took it and folded it, and he says, "I will show you how, when you want to draw one out, you can pull it out," and he folded it and gave it back to him. That was the first time I ever saw the man, to know him. He was outside of the tent. The defendant was not there. The man looked like he was full. I never saw him any more.'

"Cross-examination: 'I saw the defendant and this man together near Brock's tent before the man sold the whiskey.'

"Ellie Pierson testified in his own behalf as follows: 'I live at Grannis, in Polk county, Ark.; I knew Flanagan, or Johnson, in a way; I wasn't personally acquainted with him. On the evening of the killing I had started to the front to get a job of work, and I saw him as I passed the depot. He asked me where I was going, and when I told him he said, "Well, I was intending to go down there myself; if you don't mind, I will go along; you will have company whether I do or not." We walked together to the front. When we got to the tent we separated. I ate supper at Sam Brock's tent. Brock and his partner were there. After supper we went into the rooming tent and sat down. Flanagan, or Johnson, or Burk, whatever his name is, stepped out and was gone 15 or 20 minutes, and he came back and said, "Kid, come go with me; I am going down here after some whiskey; there is a negro out here going to bring it to me." I said, "Well, I will go up that way; I am going to Sample's to stay all night; I suppose I will just go along." I walked along with him, and the negro Lyons went with us; I did not know his name then. As we went up the railroad Flanagan said to me, "This negro is the slickest bootlegger ever come over the pike." The negro said, "Yes, cap; never have cotch me." We reached the log camp, and I said, "I guess I will stop here." Flanagan said, "No, come on and go with me; it is just a little way, and we will get a drink of whiskey." I told him I didn't care for any whiskey; I didn't drink; very seldom. He said, "Come on, any way." I went on down with him. We went down the track about a quarter of a mile from the log camp. Then he said to me, "You stay here on the track, and we will go down and see this fellow, and get the whiskey." I waited on the track. While they were gone down there talking I heard them quarreling. I heard this fellow Flanagan say, "Come on in with that money, nigger." The nigger said, "No, white folks, I left it at the house." He said, "Come on in with that money, nigger; if you don't I will kill you." I said, "I wouldn't do that." He said, "What the hell is it to you?" I said, "Nothing." He said, "I have

done killed the son of a bitch." I heard him throw something in the branch. I never left the track. Then he came back to me. He said, "You have got to leave this state with me." I asked him what that was for. He said because he was afraid he would be arrested and I could cause him trouble, and he had to get out of the state with me. He said, "If you don't, if you make any attempt to get me into trouble or have me arrested, I will kill you." I went on with him. He said, "We will go to Broken Bow tonight and stop, and you can sleep some." He had a gun; an automatic pistol. He told me of several crimes that he had committed; he said that he was wanted in Georgia for murder. In Jacksonville, Fla., for bank robbery, and in some place in Arkansas for highway robbery. When he told that I had to go with him or he would kill me, I believed the statement, and I went with him through actual fear of losing my life. We went to Bob Beavers' and stayed all night. I slept some; he didn't go to bed at all. The next morning we went in to wash, and as he stepped into another room to comb I said, "You heard this man's testimony last night; we are going through the country to Grannis, Ark.; I am going to try to get him to stay at your father's house tonight. You get the officers and come on and arrest him." He went on. We stayed that night at old man John Beavers', about nine or ten miles from Broken Bow. Flanagan's shirt had blood on it, and he pulled it off and threw it in a creek. I next left directions for the officers at Hochatown, six or seven miles from John Beavers'. From Hochatown we went to Grannis, Ark. I got away from Flanagan at Frank Arnold's, two miles from Grannis. I then went to Grannis to notify the officers before I went to my home. I searched for —— and Hungate; they were both out of town; Hungate came back late that evening. I told him about the man and the killing, and that the man was at Frank Arnold's. He said, "Well, we will go down there." Hungate went and ate supper; he then came back to town, and he and I then went to Bob Beavers', Sr. There we found Henry Stiff and little Bob

Beavers. They talked about how to arrest Flanagan. They were afraid of him, I suppose. I told them they had better hurry up, as he might get away; so they tried to get old man Bob Beavers to go along with them. They walked together, and they stopped I suppose 50 or 75 yards from the house. They sent me up to the house to get him out. They were afraid of him. I went up and called for him. Mr. Arnold came out, but Flanagan did not. I took no part whatever in the killing. I was not off the railroad track. I had nothing to do with selling the whiskey. I would say that Flanagan was half drunk that night. He talked quite a little.'

"Cross-examination:  'I had known Flanagan only about two weeks; had not been intimately associated with him. Had not gone to and from the front with him, and I did not say I had in the statement I made to you. I had been to Broken Bow only once before. He did not go with me; he was there when I got there. I did not see Flanagan call the negro out of his tent. I did not go to the negro's tent or go in. I did not say in the statement I made to you, and which your stenographer took down, that the first time I saw the negro was when Flanagan called him out of the tent. I said the first time I saw the negro was when Flanagan called me out of the tent. The negro was standing outside, between his tent and Sam Brock's. We did not go very far; probably half a mile.'

"Mr. Barnes: We have no objection to him introducing the whole transcript in evidence.

"The transcript was then introduced, and was in substance as follows: 'My name is J. E. Pierson. The man's name who cut the negro's throat is Flanagan. He goes by the name of Johnson. He lives at Wyandotte, Ga. I have known him about four or five weeks. I first got acquainted with him at Broken Bow. He stayed around there at first one place and then another. He took this negro out, and I suppose he first sold him a pint of whisky. The negro was about half drunk. He had some whisky up the track and he told the negro he wanted him to go

up there and take that down for him, and asked me to
go with them. . We got up there and sat down and were
talking, and directly he jumped on the negro about some-
thing, got into a quarrel, and he told him to come on in
with that money, and commenced kicking him, and kicked
him in the head. The negro commenced begging, and
said he had left the money at the house and would go
get it, and he said, "No, you have it now." And they
were scuffling and talking, and he knocked him down, and
grabbed his knife, and cut his throat. He told me, "You
see what I have done, don't you?" And I said, "Yes"; and
I told him at the start, and he said, "Come on with me
or I will kill you"; and I said, "No, you won't; let the
negro alone"; and he just turned around to me and said,
"What is it to you?" And after he had killed him he tore
my shirt off, and I said, "Don't do that; I don't intend to
hurt you over it"; and he said, if I would not say any-
thing about it he would let me alone, and we went on up
to George Beavers' and stayed all night, and I said we
had better go and give up, and you can swear self-defense.
He had a cut place on his vest; he either put it there or
the negro cut at him. He threw the negro in the branch.
He went through his pockets, and he told me he must
have left that money at the house; said he had $17; said
he saw it when he got that whiskey. It was done Satur-
day night,. and we stayed all night at Bob Beavers' that
night. We went to old man Bob Beavers' the next morn-
ing and stayed there that night. From there we went to
Hochatown, and stayed all night with Chesley Allen. Then
we went to Grannis and spent the night at Frank Arn-
old's, my brother-in-law, and the next morning I went
home. That was Tuesday night. Flanagan stayed around
there; he told me he was going back to my brother-in-
law's. and I gave him all the money I had, and he was
afraid I would turn him in, and he would not get away
from me until there at Hochatown. We came back to
Bob Burk's, and he told Bob Beavers that he had killed
this negro, and that I had nothing to do with it. He
would go to the penitentiary 20 years before he would let

me suffer for it; he also told Bob Burk that. The officers got me in town at the depot. Flanagan was two miles south of town; said he was going to stay all night at my brother-in-law's, and leave next morning. I haven't seen him since. He is a tall man, about six feet, dark brown hair, red complected, smooth-faced, scar on left jaw just below his eye, jawbone been broken with a pair of knucks, scar about two inches long. He weighs about 175 or 180 pounds. He said he was going to Louisiana on freight trains. My brother-in-law sent my little brother down there, and this fellow got hold of him and got sort of afraid and left there. My brother said he got a freight train at Mena, and would get a hack line out through the country. That would throw him out by Hot Springs, but he is wanted at Hot Springs under a $500 bond. He has gone by the name of Sinclair, besides his other names; he told me all about it. He has broke several jails. I have been gambling some at Broken Bow. Flanagan told me that he was an old whiskey maker. I am under bond to appear in court in Arkansas, being charged with robbing the Grannis bank. I was raised at Grannis, and used to go to school to Judge Barnes. I will be 25 years old on the 23d day of this month. I first saw the negro at Broken Bow. The first I saw of him he went to a tent and called him out. A fellow named Tom Johnson, not this man, was running the gambling house in the front of a tent. This fellow Johnson and I were together. I got with him in Broken Bow. Kirby, Ed Cole, and Will Reese are on my bond in Arkansas. I came over here without requisition papers; never saw a warrant or nothing. Mr. Stiff told me he would get me bond if I would come over here. Flanagan said he was wanted at Wyanter or Winder, about four miles from Atlanta, Ga., under the name of W. V. Flanagan. I don't know who he killed there; he said his mother's farm and his brother's farm are both up for his bond the 16th of this month. He is very talkative and pretty bad to drink. He didn't say how long he had been wanted in Georgia, but said his trial was set for the 16th

of this month. Said he couldn't afford to go back there; said if he got away he was wanted in Tennessee for highway robbery, and in Jacksonville, Fla., for murder. He is a bank robber and train robber. He is about 35 years or 36 years old. He broke jail in Oklahoma once; I think he said it was at Tulsa. He says there is no jail that will hold him. The officers stopped about 50 or 75 yards from the house and got me to go up there and call him out, and they were going to step up and arrest him while I was talking to him. He had nothing except what he had on. His whiskey was white whiskey without labels on it. He told me it was corn whiskey. My trial at Mena is set for Monday or Tuesday. Flanagan had between $15 or $20. He said the negro had two $5 bills, and one $10 bill, but said he did something with it. I don't know whether he got it or not. About the first there was to it, he sat down by the negro and commenced feeling in the negro's pocket, and the negro told him to quit, and the negro then taken out his knife, and Flanagan jumped up and grabbed his knife away from him and shut it up and put it back in the negro's pocket, and they were setting down, the first thing I knew he jumped up and commenced kicking the negro, and said, "Come on in with that money," and kicked him, and the negro said, "White folks, I left it at the house, and I will go get it"; and he said, "No, you won't," and kept kicking at him. He kicked one of the heels off his shoes, and went to Hochatown and bought him a pair of vici shoes in old man Burk's store. He had on a gray suit of clothes and flannel shirt. He tore his vest up after he said the negro cut it and threw it away. I let him have $3.'

"H. L. Stiff testified in rebuttal in behalf of the state as follows: 'I know little Bob Beavers. I saw him in Broken Bow on Monday after the killing on Saturday. He did not say anything to me about Pierson and Flanagan having been to his home on Saturday night.' "

This is a fair resume of all the testimony introduced at the trial.

The first assignment of error, and the only one we shall discuss, is based upon the proposition that the court erred in refusing to give an instruction upon circumstantial evidence. It appears that counsel requested the court to instruct upon this proposition, and submitted a form of instruction, giving the jury the law upon this phase of the case. The sufficiency and form of the instruction is criticized by counsel for the state. An examination of the same, however, and an examination of the record discloses clearly that it was sufficient to call the court's attention to the fact that this issue was in the case, within the viewpoint of the defendant, and was sufficient to raise the question for review. In fact, the instruction as requested, or rather instructions, in poorer form than the one requested, have been given and approved in many recorded cases. It appears that the trial court declined to give the instruction, not upon the ground that it was insufficient in form, but upon the ground that an instruction upon circumstantial evidence was not proper in the case. It is well settled in this jurisdiction that if an instruction requested is not in proper form, but is sufficient to call the court's attention to a material issue, it is the duty of the court to formulate and submit to the jury a proper instruction, when the record clearly indicates that no undue advantage of the court is sought. See *Roberson v. United States*, 4 Okla. Cr. 336, 111 Pac. 984; *McIntosh v. State*, 8 Okla. Cr. 469, 128 Pac. 735; *Rutherford v. United States*, 1 Okla. Cr. 194, 95 Pac. 753; *Hendrix v. United States*, 2 Okla. Cr. 240, 101 Pac. 125; *Sies v. State*, 6 Okla. Cr. 142, 117 Pac. 504; *Inklebarger v. State*, 8 Okla. Cr. 316, 127 Pac. 707; *Star v. State*, 9 Okla. Cr. 210, 131 Pac. 542; *Price v. State*, 9 Okla. Cr. 359, 131 Pac. 1102.

The law requires the trial court to submit the issue or guilt or innocence, by proper instructions, giving the jury the rule when the state relies solely upon circumstantial evidence for a conviction. In this case, the state had no other testimony. The proof offered on behalf of the defendant does not exempt this cause from the rule. The defendant testified in his own behalf and gave a complete account of the homicide. His testimony does not in any way strengthen the state's case, but to the contrary absolves him from participation in, or willful concealment of, the crime.

Other questions raised have been determined in former opinions. We will therefore forego a discussion of them.

For the error indicated, the judgment is reversed, and the cause remanded for a new trial.

DOYLE, P. J., and BRETT, J., concur.