## CROSSETT v. STATE.

No. A-11695. Dec. 24, 1952.

(252 P. 2d 150.)

210

Hal Welch, Hugo, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., and Vester V. Songer, County Atty., Choctaw County, Hugo, for defendant in error.

POWELL, J. The plaintiff in error, Roy Crossett, who will hereinafter be referred to as defendant, was charged in the district court of Choctaw county with the crime of manslaughter in the first degree growing out of a collision on U. S. Highway 70 just west of Hugo, Oklahoma, and between an automobile being driven by the defendant, a man 63 years of age, and one being driven by Bob Andrews, a youth of about 16 years, now deceased, and who died a few hours following the accident.

The jury found the defendant guilty of manslaughter in the second degree, with punishment left to the court, who assessed a penalty of two years in the State Penitentiary. Appeal has been perfected to this court.

Some 35 assignments of error are enumerated in the petition in error, but are grouped for argument in brief under seven specifications of error or propositions. We have had the benefit of exhaustive briefs and extended oral argument.

It is first set out that the information is fatally defective, in that:

"(A) It is not charged that the commission of the alleged misdemeanor was the proximate cause of the fatal collision.

"(B) The Act of 1949 relating to rules of the road insofar as it relates to driving on the left of the center of the road after passing another vehicle is void and violates the due process provision of the Constitution of both the State of Oklahoma and the United States in that same is vague in definition and uncertain to the extent that no explicit definition of acts constituting the public offense is therein contained."

In connection with the charge in the information set out, it should be kept in mind that manslaughter in the first degree is defined by Tit. 21 O. S. 1951 § 711, as follows:

"Homicide is manslaughter in the first degree in the following cases:

"1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor. * * *"

Manslaughter in the second degree is defined by Tit. 21 O. S. 1951 § 716, as follows:

"Every killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

Without quoting the entire and lengthy information, it may be stated that it does charge in substance that on December 12, 1950, in Choctaw county, Oklahoma, the defendant "did then and there wilfully, wrongfully, unlawfully and feloniously, without a design to effect the death of one Bob Andrews, but while he, the said Roy Crossett, was engaged in a misdemeanor, to-wit: * * *"

And, then, as pointed out by the Attorney General, it is in the information substantially charged that defendant was guilty of two separate misdemeanors, "committed by driving his 1950 Buick Automobile in an unlawful manner upon U. S. Highway No. 70, about one-eighth mile west of the city limits of Hugo, namely: (1) By driving his automobile to the left of the center line of said Highway, while not in the act of passing another vehicle; and (2) by driving his

motor vehicle upon said highway while he was under the influence of intoxicating liquor."

It is then alleged in substance that by means of the unlawful acts enumerated that the defendant's car struck and collided with the Ford automobile in which said Bob Andrews was riding, thereby inflicting upon his body certain mortal wounds, from which wounds he died on December 13, 1950. It is stated in Holleman v. State, 74 Okla. Cr. 258, 125 P. 2d 239, 240, as follows:

"An information or indictment which, construed under ordinary rules of construction, states all essential elements of the crime charged sufficiently to enable a person of common understanding to know what is meant, and with sufficient particularity to enable a defendant to prepare for his trial and to plead the judgment in bar, if again informed against for the same offense, is sufficient."

It is our conclusion from a consideration of the information in its entirety that every essential element of the crime, of manslaughter in the first degree is sufficiently alleged, as well as all essential elements of the two misdemeanors used as the basis for the manslaughter charge.

The information does charge two different acts or misdemeanors, in a single count, as constituting the offense of first-degree manslaughter, but such fact does not make it bad on the ground of duplicity. Hogan v. State, 42 Okla. Cr. 188, 275 P. 355; Landrum v. State, 60 Okla. Cr. 259, 63 P. 2d 994.

It would appear that the case of Coslow v. State, 83 Okla. Cr. 378, 177 P. 2d 518, 519, is decisive of the contention that the information is fatally defective for failure to specifically allege that the unlawful acts complained of were the direct and proximate cause of the death of the deceased. There the defendant was tried and convicted of manslaughter in the second degree, and sentenced to serve a term of two years in the penitentiary. The "proximate cause" element was omitted from the charging part of the information. This court held that the trial court did not err in overruling the demurrer to the information. We stated in paragraphs 2 and 3 of the syllabus:

"A demurrer to an information will not be sustained where the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended." Tit. 22 O. S. 1951 § 409.

"No information is insufficient by reason of a defect or imperfection in the matter or form which does not tend to the prejudice of the substantial rights of the defendant upon the merits." Tit. 22 O. S. 1951 § 410.

Considering subdivision (B) quoted above and to the effect that the court should have sustained defendant's demurrer to the information on the ground that the pertinent part of the 1949 Act relating to the rules of the road is unconstitutional and void, we find that counsel relies solely on the case of Connally v. General Construction Co., 269 U. S. 385, 46 S. Ct. 126, 70 L. Ed. 322. There the following principles are enunciated, and are urged as applicable here:

"1. The terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.

"2. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

"3. A statute requiring a contractor, under penalty, to pay his employees 'not less than the current rate of per diem wages in the locality where the work

is performed', is so uncertain as to deprive contractors of their property without due process of law."

It requires only a reading of the above case and the rather complete note, in connection therewith, to demonstrate its inapplicability to the statutory provisions here complained of.

Section 4(a), p. 505, S. L. 1949, provides:

"Upon all roadways of sufficient width a vehicle shall be driven to the right of the center of the roadway, except as follows:

"(1) When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement;

"(2) When the right half of a roadway is closed to traffic while under construction or repair;

"(3) Upon a roadway divided into three marked lanes for traffic under the rules applicable thereon;

"(4) Upon a roadway designated and signposted for one-way traffic."

It is provided that a violation of the Act is a misdemeanor, punishable by a fine of not more than $50 or by imprisonment in the county jail not more than 30 days, either or both. S. L. 1949, p. 507.

The effect of the allegation pertinent in the information was that at the time of the collision, defendant was not driving to the right of the center of the highway, and that such was not caused by the fact that he was in the process of passing another vehicle proceeding in the same direction defendant was travelling. That is to say, it was alleged in the information that defendant: " * * * was engaged in a misdemeanor, to-wit: driving an automobile to the left of the center of the highway and not in passing another vehicle."

We conclude that the information intended to charge, and did charge, defendant with first-degree manslaughter while engaged in the commission of a misdemeanor, to-wit: A violation of Section 4(a), supra (now Tit. 47 O. S. 1951 § 121.4).

We further decide that the misdemeanor of driving an automobile while intoxicated is included in the information as one of the unlawful acts forming the basis of the manslaughter charge. 47 O. S. 1951 § 93.

By proposition two, defendant argues that "The evidence was insufficient to support the verdict of guilty. (A) It does not establish any acts of negligence on the part of the defendant; (B) It does not establish that the death of the deceased was caused by the collision."

Of course it is elementary that where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, this court will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts. Sadler v. State, 84 Okla. Cr. 97, 179 P. 2d 479. While conflicting, the evidence was amply sufficient to have supported the charge of manslaughter in the first degree, if same had been believed by the jury. It is not necessary to demonstrate this statement from the evidence, as the accused was, as stated, simply found guilty of manslaughter in the second degree. Only incidental reference will be made to the evidence concerning intoxication.

We have carefully studied the evidence and agree with the Attorney General, where he says: "To decide the issue of whether the collision was caused by the unlawful acts of defendant, depends upon a review of the entire evidence.

The record in this case contains approximately 300 pages of testimony. Thus we have not attempted to give a full and complete analysis of all the evidence in the case. Numerous photographs and plats will be found in the record. *A review of the entire evidence will show that the evidence is very conflicting on some of the material issues involved. Especially as to the manner and cause of the collision.*" (Italics supplied.)

And while a review by this court of the entire record convinces us that the evidence on the part of the State, standing alone, is sufficient to sustain the verdict of the jury in finding the defendant guilty of manslaughter in the second degree, we do not feel called upon and we shall not undertake to demonstrate from the record evidentiary matters justifying this conclusion, under this proposition, and later only incidentally in treating further issues, that we are convinced must decide at all events the outcome of our consideration of this appeal.

We shall notice, under the proposition being treated, the thought that "it is not established that the death of the deceased was caused by the collision. * * * This evidence is wholly insufficient to establish the corpus delicti beyond a reasonable doubt."

Our attention is called to Tit. 21 O. S. 1951 § 693, reading:

"No person can be convicted of murder or manslaughter, * * * unless the death of the person alleged to have been killed and the fact of the killing by the accused are each established as independent facts beyond a reasonable doubt."

From a review of the evidence we find that it is true that for some reason, no doubt plain and simple oversight, the State did not prove by the physician attending the deceased, in so many words, just what did cause the death of Bob Andrews. Counsel for the defendant complains that the State failed to prove by positive evidence that any wound was inflicted upon the deceased, such as a caved-in chest, a skull fracture, or broken bones. It is inferred that deceased could have died of some other unusual intervening cause. It is further stated: " * * * We have been unable to find in Oklahoma or elsewhere, that a conviction has been upheld, in the absence of proof of an actual wound or injury to the *defendant* [deceased], likely to cause death."

We decide, however, that the oversight of the prosecution in this case was not fatal, because no authority has been cited, or compelling reason advanced, requiring that proof of death, and cause of death, be made through the media of medical evidence, where such is available, even though common judgment might so dictate. But as pointed out by the Attorney General, no issue was raised by defendant in the way of proof or even contention that defendant's death was caused by some injury other than that received in the collision.

On the other hand, in the case of Osborn v. State, 86 Okla. Cr. 259, 194 P. 2d 176, this court said:

" * * * Direct and positive proof is not essential to establish the corpus delicti, and it may be proved by circumstantial evidence. When it is proved by circumstantial evidence, the question should be submitted to the jury along with other questions of fact in the case, as to whether or not the state has established the corpus delicti beyond a reasonable doubt."

See, also, Brown v. State, 9 Okla. Cr. 382, 132 P. 359; Saulsbury v. State, 83 Okla. Cr. 7, 172 P. 2d 440.

The state by three witnesses, two of whom arrived at the scene of the accident immediately after it happened, and one of whom was with Bob Andrews at the hospital continuously until he died, in connectoin with the other evidence,

portrayed facts and circumstances amply sufficient to establish that the deceased died as a result of injuries caused by the collision in question. The corpus delicti was so established by circumstantial evidence, as may be demonstrated by this succinct summary by the state:

"It appears from the testimony of William Jones that he was one of the first witnesses to arrive at the scene of the accident. He got there before the occupants were removed from the two wrecked automobiles. Mr. Jones testified that he went up to the '49 Ford and saw Bob Andrews sitting in his car under the steering wheel. He said he saw that Andrews was hurt and tried to get him out of the car. That he got him out of the car and laid him on the ground by the side of the car and put a pair of pants under his head. The witness said, 'that was about all I could do until the ambulance got there.' He said, 'I waited until the ambulance came and the highway patrol.'

"Grady Holton testified that he lives a mile west of Hugo on the north side of Highway 70, just immediately west of the drive-in theater; that he had just gone to bed, but was not asleep at the time of the accident; that he heard the crash of the cars and got up and put on his clothes and went down there. He testified that when he arrived at the place of the accident they already had Bob Andrews out of his car; that he was lying on the shoulder of the road and was unconscious.

"Mrs. June Blakely lives in Hugo. She testified that Bob Andrews was her nephew. He was 16 years old, a student in junior high school, and was living in her home on the night of the accident. She testified that he left her home in her '49 Ford car that night some time after nine o'clock, about 9:10 p. m. She said when he left home he was in a good state of health. She testified she next saw him that evening about 9:35 in the Memorial Hospital, in Hugo. She said, 'I stayed until he died about 4:30 the next morning.' "

Counsel sets out as reversible error, "Misconduct of the trial judge in departing from the jurisdiction of the court after the case was finally submitted to the jury."

We have examined the facts as disclosed at hearing on motion for new trial, and as stated in defendant's brief. The journal entry of the trial proceedings, entered under date of June 29, 1951, is not in conflict with anything asserted, is sufficient for consideration of the proposition raised, and reads in part:

"And the closing argument for the State is made by Vester V. Songer, County Attorney, (at 10-05 P.M.). The jury retires in the custody of sworn bailiffs to deliberate on a verdict in this cause.

"At midnight the jury is called into court by the Judge and ordered to cease deliberation until June 30, 1951, at 8 A.M. all exhibits and instructions are turned back into the court, and the jury retires in custody of sworn bailiffs until Saturday, June 30, 1951, at 8 A.M. Court recesses."

A reading of Raab v. State, 62 Okla. Cr. 361, 71 P. 2d 773, cited by defendant, will disclose its inapplicability. Rather, the proposition is governed by Little v. State, 79 Okla. Cr. 285, 154 P. 2d 772, 778, where the identical question here raised was treated and where the facts were much as in the present case. Said Jones, J., for this court:

"We see a distinction in the facts as quoted in Raab v. State, supra, to those herein involved. Here, the forms of verdict, the instructions, and other papers introduced as evidence during the trial were withdrawn from the jury and they were directed to cease deliberation upon the case and retire for the night and were further directed to be in court at 10 a. m., to resume their deliberation. It was during this period between the time of the retirement of the jury and 10 a. m., the following morning that the trial judge drove to his home and slept a few hours and returned to the courtroom and was present when the jury was

brought to the courtroom by the bailiff to receive the forms of verdict and other papers for the purpose of further deliberating upon the case. The presence of the judge was not absolutely necessary while the jury was sleeping as authority to deliberate further upon the case had been temporarily withdrawn. The reasoning in the Raab case and the cases cited therein in support of the rule is not applicable to the instant case because no question could arise calling for the presence of the trial judge while the jury was not considering the case."

Counsel contends that the court erred in permitting the jury to have certain exhibits in the juryroom during its deliberations. It appears that all the exhibits introduced during the trial were taken to the juryroom. Among such exhibits was a quart bottle of beer and a quart broken beer bottle with cap intact on the neck opening. In that the defendant had admitted that he had purchased the two bottles of beer just prior to departing from Hugo for Soper and just prior to the accident it is contended that the exhibits could add nothing and could not aid the jury in their deliberations, and that the two beer bottles were sent to the juryroom by the state in an obvious effort to overemphasize the possession of the beer and prejudice the defendant in the eyes of any juror who might have radical views as to the possession or drinking of beer, even though it might be done lawfully. While the argument of counsel is not without merit, this court has held that the permitting of the jury to examine the exhibits is a matter largely within the sound discretion of the court as counsel in his brief admits, and the rule is too well established, and the facts not sufficient to justify a conclusion of abuse of discretion by the court. Tit. 22 O. S. 1951 § 893; Camp v. State, 66 Okla. Cr. 20, 89 P. 2d 378; Brown v. State, 52 Okla. Cr. 307, 4 P. 2d 129.

We now come to the final and decisive fifth and sixth propositions raised by the defendant, and being all the specifications necessary for treatment: "The erroneous instruction of the court", and, "Failure of the court to instruct on defendant's theory of the case", which we shall consider together.

It is contended that instructions 7, 8, 9, 10, 11 and 12, which partially covered the theory of the state and which were given over the objections and exceptions of the defendant, were erroneous. It is urged by the State, on the other hand, that the instructoins when considered as a whole were not misleading and fairly and correctly stated the law applicable to the case. Burroughs v State, 80 Okla. Cr. 271, 158 P. 2d 723 is cited in support of this contention.

While the instructions complained of might have been improved upon, we do not find sufficient ground for complaint to justify quotation and discussion except as to Instruction No. 8, given by the court and excepted to, as heretofore stated. The defendant, while charged in the information with the unlawful manner of operation of his vehicle at the time of the accident so as to accuse him of two different misdemeanors, that is, driving while under the influence of intoxicating liquor, and driving to the left of the center of the highway while not in passing another vehicle, accused, as stated, was only found guilty of driving in a culpably negligent manner, constituting manslaughter in the second degree, and was therefore not found guilty of driving while committing one or both of the specified misdemeanors to be guilty of either of which would have constituted manslaughter in the first degree. In other words, the crime for which the accused was convicted involves as a basis culpable negligence, Tit. 21 O. S. 1951 § 716, and it was therefore most important to the defendant that a correct instruction covering the subject be given. Accused so contends, and with this proposition we must agree. We therefore consider Instruction No. 8, given, which reads:

"No. 8. Manslaughter in the second degree is any killing of one human being by the act, procurement, or culpable negligence of another which does

not amount to murder or manslaughter in the first degree, or excusable or justifiable homicide.

"Culpable negligence, as used in these instructions, means the omission to do something which a reasonable, prudent and honest man would do, or the doing of something which such a man would not do under the circumstances surrounding the particular case. An act or omission, to be culpable, must be such as would cause a reasonable, careful man to foresee that the result would be productive of injury to others."

The above instruction seems to be substantially as one given in Clark v. State, 27 Okla. Cr. 11, 224 P. 738, though it does differ by the omission of a number of words. In Nail v. State, 33 Okla. Cr. 100, 242 P. 270, 272, this court did say:

"The foregoing definition, it seems to us, is redundant in the use of the word 'honest.' Negligence does not depend upon the honesty of the individual in the usually accepted sense, but upon his prudence and care or the lack thereof with which his acts are done in the particular case."

In the Nail case the writer of the opinion of this court quoted from Beven on "Negligence in Law", Vol. 3, p. 7, which has been since approved in a number of other cases, and may be referred to for details. See Wilson v. State, 70 Okla. Cr. 262, 105 P. 2d 789; Freeman v. State, 69 Okla. Cr. 164, 101 P. 2d 653, and note in 161 A. L. R. pp. 42-46; Chandler v. State, 79 Okla. Cr. 323, 146 P. 2d 598.

As stated in the Nail case:

"By no means every instance where one person is injured or killed by a vehicle driven by another do the circumstances constitute a crime. There must be negligence rising to the degree of criminal or culpable negligence. The culpability of a defendant is a question of fact for the jury, and the test is: Do the acts charged as criminal show a degree of carelessness amounting to a culpable disregard of the rights and safety of others, and did said acts cause the death of deceased? If so, it establishes a case of criminal negligence."

The prevailing and correct definition of culpable negligence as adopted by this court may be stated as follows: Culpable negligence is the omission to do something which a reasonable and prudent person would do, or the want of the usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions.

It may be said that the above instruction is preferable to the one given, but it is our thought that the one given is not so fundamentally different as to form the basis for a new trial. The trial court in a future situation would, of course, give the clearer instruction last quoted. Failure to do so might lend further and determining adverse weight to a cumulation of irregularities that might exist and be urged in such future case.

In the defendant's brief counsel states in support of his sixth proposition:

"Aside from the evidence tending to support the State's contention that the defendant was intoxicated, the State presented no evidence whatever which would support a conviction in this case, either on the grounds of negligent operation of a motor vehicle or the commission of a homicide while engaged in a misdemeanor, to-wit: Driving to the left of the center of the highway not in passing another vehicle;" and, it is stated further: "The trial court wholly failed to give any instructions in recognition of the defense testimony that he had passed a vehicle immediately prior to the accident, and therefore had a right to be on the left of the center of the highway in so doing, and wholly ignored the requested instructions of the defendant defining the rules of the road in such a case."

Counsel in his brief further states:

"In passing this vehicle, Crossett had driven to his left, or the south of the center of the road, in the customary manner, and had not at the time the vehicle of the deceased came into his view pulled his automobile back over to the right or north side of the highway; it was the theory of the defense that the automobile of the deceased was driven rapidly from the driveway leading into the Drive-In-Theatre onto the highway in such a manner as to confuse and startle the defendant by its unexpected appearance on the north side of the highway, proceeding directly toward and in the path of the defendant's automobile.

"It is apparently conceded by the contentions of the parties that both automobiles were on the south side of the road, immediately preceding the collision and that both swerved to the north, and that in so doing they came together, when, had either of them remained on the south side of the road and continued in the direction it was travelling while the other turned to the north, as was done by each, the collision would not, in all probability [have] occurred."

The rules of the road pertinent to the issues raised are covered by Tit. 47 O. S. 1951 §§ 121.4(c) (1), 121.5 and 121.6, as follows:

"§ 121.4(c) (1) The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle."

"§ 121.5 Turning, slowing and stopping.—(a) The driver of a vehicle intending to turn at an intersection shall do as follows: * * *.

"(2) Approach for a left turn shall be made in that portion of the right half of the roadway nearest the center thereof, and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center of the roadway being entered. * * *

"(d) No person shall turn a vehicle at an intersection, unless the vehicle is in proper position upon the roadway as required in paragraph (a) * * *.

"§ 121.6 Right of way.—(a) The driver of a vehicle approaching an intersection shall yield the right-of-way to a vehicle which has entered the intersection from a different highway. * * *

"(1) The right-of-way rules declared in paragraph (a) are modified at through highways, and otherwise, as hereinafter stated in this Section. * * *

"(c) The driver of a vehicle shall stop as required by this Act at the entrance to a through highway, and shall yield the right-of-way to other vehicles which have entered the intersection from said through highway, or which are approaching so closely on said through highway as to constitute an immediate hazard, * * *.

"(d) The driver of a vehicle about to enter or cross a highway from a private road or driveway shall yield the right-of-way to all vehicles approaching on said highway."

Treatment of the question raised requires first a careful consideration of the proof offered by defendant. The entire evidence fails to disclose that there were any actual eyewitnesses to the collision immediately prior to or at the moment of impact except the deceased and the defendant, and there is no record that the deceased ever made any statement as to what happened. The defendant did testify, however, that he attended a bank directors meeting of the State Bank in Hugo which commenced about 4:00 p.m., and that on adjournment one of his colleagues produced a "fifth" of liquor and some soft drinks and the members, shown to have been seven in number, drank mixed drinks. The cashier of the bank testified that the meeting broke up about 5:30 or 5:40 p. m., and that he drove the defendant and Dr. Wyche to the O'Neal Chevrolet agency where the defendant had left his car for some repairs shown by Dr. Wyche to have been to the radio. Dr. Wyche testified that defendant drove his car to

near the office of witness, parked it, tried out the radio, and then went up to the office with him to discuss a minnow fish hatchery and soon he and defendant left and witness went home as his wife had 'phoned for him that she was feeling ill. Witness stated that no drinks were partaken of by either witness or defendant after leaving the bank. The defendant testified that he attended the Erie picture show for around an hour and a half, and then got in his car, drove by a place called The Tavern, drank a bottle of beer and purchased two more bottles to take with him to put in his refrigerator, and drove onto U. S. Highway 70, driving west towards Soper, his home. Witness further testified:

"Q. You heard the testimony this morning of your passing a car a short distance before the point of the accident by going around him? A. Yes sir. Q. Do you recall that occurrence? A. Yes, sir. Q. As you passed that car and proceeded towards the drive-in theatre and that drive-way where the accident happened near the culvert, about what rate of speed were you travelling? A. I imagine about 40 miles an hour. That is generally the rate of speed I travel at night. Q. Back to the point around Moore's grocery, that is about where you passed this other car? A. Yes sir. Q. Were the lights of any other car visible to you as coming towards you on the highway? No, sir. Q. I want you to tell the jury your version of what happened at the accident. A. Well, it is hard to tell just what happened, it all happened so quickly. I went around to the left of this car at Moore's grocery. I had just about got back, probably to the middle of the road, maybe a little more to the right. All at once a bright light came angling across from the north. My first impulse was to pull right. I saw him angling farther, and I cut to the left to get out of his way. About that time I noticed he was looking like he was going farther and I cut back to the north and about that time we hit. If either one of us had turned back to the north and the other to the south, we never would have hit. Q. You both went to the south? A. Both went to the south and then both went to the north. Q. In looking back over it, you have been over that ground since then? A. I have been and I studied it every time I went over it. Q. In your opinion where did that car come from? [Objection overruled] A. Of course, that night I couldn't tell. The drive-in theater was going but not looking, I didn't look for it, couldn't expect it, could not have come from near where the drive-in theater is, it was protected with a board fence and you could not see, and the light came all at once in front of me, I was startled to know what to do. My first impulse was to go one way, it looked like he was coming right at me, and the next was to get out of the way. Q. Did you do what you could when confronted with that car and light, did you do all you could to avoid an accident? A. I did everything I knew to do."

The defendant produced a witness, Tommie Hider, who testified that on the night of December 12, 1950, he was driving on Highway 70 west of Hugo to the West End [Moore's] Grocery. That his wife and two children were with him; that he lived in Sawyer and they were going to visit his brother, B. Hider, who lived in one of Moore's cabins near the grocery; that his brother lived in the first house as one drives off the highway on the north. The witness further testified:

"Q. When you got to the point of the drive-way on the highway, tell the jury what you did. A. When I got to that point, turn to the right, I slowed down to turn to the right. I looked in front of me, in the back, you know, to see if everything was clear, and I noticed another car coming behind me. I turned off and he went straight on. Q. He came around you? A. Yes, sir. Q. And went on down the highway? A. Yes, sir. Q. At that time were the lights of any car shining down in the road from the west? A. No, sir. Q. After you left the highway, or at the time you left the highway, this car that was coming behind you, passed you, is that right? A Yes, sir. Q. Did you within a matter of a few moments after that hear a crash? A. Yes, sir. Q. I wish you would fix as definitely as possible, tell the jury where you got to in your car, and what had happened by the time you heard the crash. A. Well, when I turned off and went to this house about a hundred feet from the highway, I killed my

motor. I hadn't got out of the car until I heard the crash, I guess five or ten minutes. * * * Q. You did not stop anywhere before you got to the front of your brother's house? A. No, sir. Q. You just pulled off the highway and drove up and stopped at your brother's house, cut off the motor and started to open the doors, and you heard the crash? A. Yes, sir. Q. You did not time yourself? A. No, sir. Q. I believe you said that immediately before pulling off the highway there was the light of a car behind you but there was no light visible coming from the west? A. No, sir. Q. What did you do after you heard the crash? A. We just—I just got out of the car and we all walked towards the highway, going down to see. Q. You went down to where the wreck occurred did you? A. Yes, sir. Q. When you got there, you saw the two cars that were in the wreck? A. Yes, sir. Q. Did you go up and examine any of the people? A. No, sir. Q. You had your family and your children and you stayed back some distance from where it happened, I guess? A. Yes, sir. Q. From what you saw would you say that the car that passed you was one of the cars in that wreck? A. Yes, sir. * * * Q. When you got up there and saw the car that was sitting on the east side of where the wreck was, did you recognize it as the car that passed you? A. Yes, sir. Q. When that car passed you back there just before you pulled off the highway was there anything about his driving that attracted your attention as to being too fast or reckless in any way? A. No, sir. Q. So far as you could tell the operation of that automobile as it passed you was in all respects proper? A. Yes sir. He was just going on down the road. Q. Was he going at a rate of speed such as to attract your attention? A. No, sir."

The evidence showed that the deceased, a boy 16 years of age, had only recently been fitted with glasses and had obtained his driver's license less than two months prior to the accident.

Cecil Snapp, highway patrolman, on cross-examination, testified with reference to the tracks made by the car driven by the defendant:

"A. It was going back to the right at the point of the impact. Q. But it swerved to the left, then to the right, is that right? A. Yes, sir."

And on direct examination he had testified concerning the tire marks of defendant's car:

"Q. Could you trace the tire marks west? A. The highway runs west. The tire marks was in a circular motion at the center line and down almost off the pavement and then started back northwest. Q. Almost off which side? A. The south side, looked about 22 inches of being off the pavement, then turned back northwest."

Witness further testified that defendant's car tires first made marks on the pavement two feet south of the center line of the highway, this indicating that he was nearly back on his correct side of the highway when he put on his brakes.

Highway Patrolman Earl T. Wade testified as to the point of impact of the two automobiles, stating that the right front of the Buick (defendant's car) indicated impact and as to the Ford that it was between the right front door and right front of the automobile, and that the collision took place directly on the center line of the highway.

William Jones had testified for the state that he lived about three miles west of Hugo and on the night of December 12 had attended a picture show in Hugo and accompanied by Edsel Griffin and Edsel's mother, was returning home west along Highway 70, driving about 35 or 40 miles per hour. That he did not remember any car speeding around him; that he and his companions came on a wreck about one and a half miles west of Hugo on the highway between a Buick and a Ford. They were the first ones at the scene. A few moments later other persons came up. He did not hear the impact of the cars.

Based on the recited evidence, as well as pictures of the highway at the scene of the collision, the driveway into the Drive-In Theater and into the Moore Grocery and cottages, defendant prepared and requested the court to give instructions numbered 1 to 13. We do not feel justified in quoting these instructions, except No. 13, as they, with the exception mentioned, cannot be said to be in proper form. Council in effect tacitly so admits, but such instructions were sufficient to call the court's attention to the defendant's theory of defense, which defense had a basis of support in the evidence. In fact, requested instruction No. 13 merely constituted the gist of the statutory rules of the road, Tit. 47 O. S. 1951 §§ 121.5, 121.6. We quote:

13. The rules of the road require that one entering a public highway from a private driveway yield the right-of-way to all vehicles approaching such intersection and that one entering a highway from an intersection, drive or roadway for the purpose of making a left hand turn is required by law to drive to a point on the highway so entered so that when he turns to the left his vehicle will travel to the right of the center of the roadway so entered."

We do not find from careful reading of the 27 instructions given where defendant's theory of the case and defense was set out in positive form. He was entitled to a clear affirmative instruction embracing his theory of the defense. The statutory rules of the road defining the duties of the respective parties, as disclosed by the evidence, should have been clearly set out.

From our study of the record before us, we conclude that the defendant was entitled to an instruction affirmatively informing the jury of the defense which he interposed, and that was that the defendant contended and offered evidence to show that he was proceeding on the highway in a careful and prudent manner and that as he overtook and passed a car (Heider) proceeding in the same direction, and being to the west, that he drove to the south side of the highway and that after he had passed the automobile which he had overtaken and before he had time as a prudent operator of his automobile to return the same to the north side of the highway, he saw the automobile driven by the deceased coming sharply towards him at an angle from the direction of the Drive-In Theatre on the north side of the highway, and that the defendant first turned his automobile towards the south and then back to the north side of the highway in an effort to avoid the collision, but was unable to do so. Defendant was then entitled to a direction in conclusion: "and if you find such facts to be true or have a reasonable doubt thereof, it will be your duty to find the defendant not guilty."

This court has held that a defendant is entitled to an affirmative instruction embracing his theory of defense. Turpen v. State, 89 Okla. Cr. 6, 204 P. 2d 298; Tillman v. State, 82 Okla. Cr. 276, 169 P. 2d 223. And where the evidence justifies and when defendant requests an instruction or instructions covering his theory of the case, he is as a matter of right entitled to have such instruction or instructions given. Underwood v. State, 23 Okla. Cr. 119, 212 P. 1010; Bradley v. State, 63 Okla. Cr. 203, 74 P. 2d 126; Skelley v. State, 64 Okla. Cr. 112, 77 P. 2d 1162; Linde v. State, 61 Okla. Cr. 136, 66 P. 2d 527. In the Skelley case this court said:

"It is the duty of the court to instruct the jury from both the standpoint of the state and the defendant; and the defendant had the right to have a clear affirmative charge based upon the hypothesis that her testimony and the testimony of her witnesses was true, when this testimony affects a material issue in the case."

Under the circumstances as in this case, where there was evidence of intoxication, the jury might not have believed defendant's theory and evidence, but nevertheless he was entitled to have his theory clearly presented to the jury,

where there was basis in the evidence to support it, and the jury should have then been afforded the opportunity to give consideration to it. If the instructions as submitted appeared to the court not to have been in proper form, (and we have determined they were not, with the exception of No. 13) or fully or correctly stated the issues, still if the instructions submitted were sufficient to have called the court's attention to the material issues raised and which had a basis of support in the evidence, it was the duty of the court to have prepared and given a proper instruction or instructions on the issues thus presented to the court. In this case two or three instructions would have fully presented defendant's theory and defense. See Thomas v. State, 13 Okla. Cr. 414, 164 P. 995; Pierson v. State, 13 Okla. Cr. 382, 164 P. 1005; Roberson v. U. S., 4 Okla. Cr. 336, 111 P. 984; McIntosh v. State, 8 Okla. Cr. 469, 128 P. 735.

This court in the eighth syllabus of Palmer v. State, 78 Okla. Cr. 220, 146 P. 2d 592, 593, said:

"The policy of the law is that all persons shall have a fair and impartial trial. It cannot be said that a fair and impartial trial has been had unless the jury have been properly instructed as to the law of the case; and where the instructions do not fully present all the material issues raised, the judgment of conviction will be set aside."

See, also, Miles v. State, 41 Okla. Cr. 283, 273 P. 284, 286.

In order for the state to make out a case against the defendant Crossett, it was, as heretofore stated, necessary (in the absence of a finding of guilt by driving while intoxicated, or guilty of driving to the left of the center of the highway not in passing another vehicle) that the jury find that the collision was caused by his culpable negligence. Something more than slight negligence was necessary. See, for a full discussion as applied to fatal motor accidents, Freeman v. State, supra, and other cases heretofore cited.

We note from the record that the jury had great difficulty in reaching a verdict; that when the jury was polled the first time one juror stated that the verdict was not his; that he could only agree to a fine and not imprisonment. The court then prepared different forms of verdicts where the punishment would be left to the court, if the jury could not agree as to the same, and finally a verdict was returned of manslaughter in the second degree, which could have been just a fine or imprisonment of any time in the county jail not exceeding one year, or both, or by imprisonment in the penitentiary for not more than four years and not less than two years. Tit. 21 O. S. 1951 § 722.

Apparently, the jury had difficulty applying the law announced to them to the evidence adduced. Of course, it could be that had the court by proper instructions fully covered defendant's theory of the case, still, the verdict would not have been different. That is all speculative. However, that may be, and in spite of the unfortunate situation as to the evidence with reference to cocktails and the bottle of beer partaken, that was just one side of the case, and where instructions do not fully present all the material issues raised, a fair and impartial trial has not been had and under the uniform holdings of this court a judgment of conviction, under such circumstances, will be set aside.

Finding basis in the evidence to support defendant's specification of error No. 6, we are by force of the rules of law compelled to, and hereby do reverse the verdict and judgment of conviction in this case and direct that this defendant be granted a new trial with further proceedings not inconsistent with this opinion.

BRETT, P. J., and JONES, J., concur.