## CHARLES THOMAS WINGFIELD v. STATE.

No. A-10417.    Sept. 12, 1945.

(160 P. 2d 945.)

George C. Crump, of Wewoka, and W. J. Crump, of Muskogee, for plaintiff in error.

Randell S. Cobb, Atty. Gen., Mainard Kennerly, Asst. Atty. Gen., and Douglas Garrett, Co. Atty., of Muskogee, for defendant in error.

BAREFOOT, P. J.    Defendant, Charles Thomas Wingfield, was charged in the district court of Muskogee county, with the crime of murder, was tried, convicted of manslaughter in the first degree, and his punishment assessed at 25 years in the State Penitentiary. From this judgment and sentence he has appealed.

It is unnecessary, in order to properly dispose of this case, to consider all the errors assigned, but the con-

clusion which we have reached necessitates a short statement of the facts, as revealed by the record.

The defendant was charged with murder in connection with the killing of Edward F. Kucza, age 21 years, a soldier stationed at Camp Gruber, in Muskogee county, on the night of September 20, 1942.

Defendant was not a soldier, but was employed by the United States Government in a warehouse at Camp Gruber. He lived in a cabin in the northeast part of the town of Braggs, in Muskogee county, and near Camp Gruber. Defendant owned another cabin, just south of the one in which he lived, and a soldier, Corporal Elliott W. Sanders, and his wife occupied this cabin. The two cabins were only 12 or 15 feet apart, and were only about one block from the business district of Braggs.

Corporal Sanders testified that on the night of September 20, 1942, he and his wife had retired early, and Mrs. Sanders remembered that they had no bread for breakfast. Corporal Sanders got up and went to the store for bread (Mrs. Sanders worked, and had to leave home at 7:26 in the morning). As he returned he saw some one, later identified as deceased, coming from one of the near-by cabins. Witness went around his own cabin to the door, and as he did so, the deceased came up on the other side and witness saw him peeping through the window of his cabin. Witness asked him what he was doing there, and the deceased did not answer. He asked him again, and when he did not get an answer the second time, witness said: "Well, the best thing for you to do is to go back to town or wherever you came from."

Witness went in his cabin and was told by his wife that some one had been peeping in the window and walking around, and witness went out again to see if the man

he had seen had gone away. Deceased was about 25 feet away, near another cabin, and witness again asked him if he was looking for anyone, and saw that deceased had a gun in his hand. Witness said: "Put that gun away, I am not afraid of it." Deceased took a step forward and said, "No, you can't do that," and raised the gun up, and said, "Now, by God, if you want anybody to go, you son-of-a-bitch, you start moving." When witness did not move, deceased said, "I mean, by God, you start moving." Witness then started back to his cabin, but turned around, and deceased fired one shot. Witness Sanders then went into his house, and told his wife what had happened. They went to the cottage of the defendant, and defendant advised the witness to go to the military police. Sanders left his wife at the home of the defendant and went to town for the military police. He soon returned with four military police officers and they searched, but could not find anyone. The witness Sanders accompanied the police back to Braggs to identify the party, if they should find him. Mrs. Sanders remained with the Wingfields.

The defendant testified that soon after Sanders and the police left, he heard some one near the Sanders cabin. He picked up a 410 double-barrel shotgun and put two shells in and stepped outside. His wife accompanied him. He saw no one, and went to the door of the Sanders cabin and looked in, but did not see anyone. Just at this moment some one came from around the cabin. He asked him, "What do you want here, what are you doing here? The party, who was deceased, did not answer, and witness ordered him to leave, and when he did not do so defendant started "marching him out of the yard, he was still in my yard," intending to take him to the military police. When deceased did not move as fast as de-

fendant thought he should, he fired one shot over his head from the 410 shotgun. He then marched deceased down the street toward the business section of Braggs, where the military police were located. When they reached the corner, deceased attempted to go straight on, and defendant twice ordered him to turn to the right.

This testimony of the defendant is corroborated by Clarence Harris, who lived at the corner. Harris testified that upon hearing loud talking he went to his window and could see both defendant and deceased, and the wife of defendant who had accompanied them. Harris testified that he saw the deceased turn to the right on the sidewalk towards town. They had gone about 60 feet when they went out of the sight of the witness Harris, and into the shade of a large tree near the sidewalk. Just after going out of sight, Harris heard a shot fired and he dressed and immediately went to the scene. When he arrived a number of people were there, including two military police who came from town after hearing the cries of the defendant and his wife for the military police. The deceased was found lying on his back, suffering from a gunshot wound in his right breast. Defendant was standing nearby with the shotgun in his hand and admitted that he had fired the shot which struck deceased.

Defendant stated that deceased had turned around facing him and attempted to place his hand in his shirt, and that he thought he was going for a gun in an attempt to shoot him, and that he shot deceased in self-defense and fear of his life. Mr. Harris testified to hearing the defendant, just after the shot was fired, saying, "Don't you make no gun plays with me."

The defendant was arrested by Constable Simons, who came to the scene immediately. There was certain

testimony as to defendant wanting to be arrested by the military police instead of Constable Simons, but this is not material for a consideration of the errors alleged.

Defendant demanded that the military police search the deceased for a gun. He made this demand three times, and the police searched deceased three times, but no gun or other weapon was found on him. At the hospital three cartons of .45 cartridges were taken from the trouser pockets of deceased.

The doctor who examined deceased and who made an autopsy found that deceased had died as a result of a gunshot wound just below the right nipple. A number of the shot were removed and introduced in evidence. Some of them had penetrated the heart, and a part of the "wad" was taken from the liver.

A great amount of evidence was introduced which it is unnecessary to discuss. This was with reference to the location of the premises, and pictures taken and introduced in evidence. The cross-examination of defendant and wife was lengthy. Many leading questions were asked which it is contended were prejudicial to the defendant.

A number of the errors assigned need not be discussed for a proper determination of this case.

The alleged errors we consider necessary to discuss are with reference to certain instructions given by the court, and excepted to by defendant.

It is contended that the court erred in giving instruction No. 8, which is as follows:

"If you have a reasonable doubt that the defendant is guilty of murder as above submitted, you may next inquire as to whether or not he is guilty of the crime of

manslaughter in the first degree—and if you shall believe from the evidence beyond a reasonable doubt that at the time and place stated in the information the defendant Charles Thomas Wingfield did unlawfully shoot and kill the said Edward Kucza with a deadly weapon, to wit, a shotgun, but that such act of killing was perpetrated without a premeditated design on the part of the defendant to effect the death of the said Kucza but in a heat of passion.

"Or, if you should find that at the time and place alleged in the information the said Edward Kucza was making or appeared about to make an unlawful attack upon the defendant with a gun and should you further find beyond a reasonable doubt that in resisting such attack upon the defendant with a gun, and should you find beyond a reasonable doubt that in resisting such attack or threatened attack it was necessary for the said Wingfield to kill the said Kucza, and that from the nature of the attack or threatened attack and under all the circumstances as shown by the evidence, it did not reasonably appear to the defendant that it was necessary to kill the said Kucza with a gun to prevent great personal injury then and there to himself, and that he then, under such condition, killed the deceased.

"Then and in either event as above set out (if you find either state of facts to be true beyond a reasonable doubt) it will be your duty to find the defendant guilty of manslaughter in the first degree and so say by your verdict—unless you further find that said killing was justifiable, or have a reasonable doubt thereof, in which case you should acquit him."

This instruction, taken as a whole, correctly states the law, but the wording may have caused confusion in the minds of the jury. On a retrial of this case, the court will no doubt rewrite this instruction, so that the latter part of the instruction, where the court uses the phrase, "then and in either event . . . it will be your duty to find the defendant guilty . . . ," can be omitted, and

thus eliminate any possibility of the jury being confused as to the court's meaning.

The next assignment of error is with reference to instruction No. 9, which is as follows:

"Gentlemen of the jury, you are instructed that the laws of the State of Oklahoma pertaining to the right of a private individual to make an arrest are as follows:

" 'A private person may arrest another;

" 'First: For a public offense committed or attempted in his presence.

" 'Second: When the person arrested has committed a felony although not in his presence.

" 'Third: When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it.

"-'He must, before making the arrest, inform the person to be arrested of the cause thereof, and require him to submit except when he is in actual commission of the offense or when he is arrested on pursuit immediately after its commission.

" 'A private person who has arrested another for the commission of a public offense, must, without unnecessary delay, take him before a magistrate or deliver him to a peace officer.

" 'Any person making an arrest must take from the person arrested all offensive weapons which he may have about his person, and must deliver them to the magistrate before whom he is taken.'

"Therefore, gentlemen of the jury, if you find and believe beyond a reasonable doubt that the defendant did make an arrest of the deceased Kucza but failed to comply with any one or all of the above quoted statutes applicable to such arrest, then and in that event the defendant would be engaged in an unlawful act and could not invoke the doctrine of self-defense."

A part of this instruction is an exact quotation from 22 O. S. 1941 § 202, which is the statute giving a private individual the right to make an arrest.

There can be no question as to this instruction being a proper statement of the law insofar as it quotes the statute, but it is contended by defendant that under the facts and undisputed evidence the court was not justified in giving this instruction, and especially the last paragraph, which instructed the jury that if they found certain facts with reference to the terms of the statute "the defendant would be engaged in an unlawful act and could not invoke the doctrine of self-defense."

We considered it necessary to give a short statement of the facts in order to properly consider this instruction.

The county attorney representing the state, and he did so in a very able manner, attempted to show by a cross-examination by defendant's witnesses that the deceased was not the party who was peeping into the window of the witness Sanders, and not only that he did not fire the shot at or above Sanders, but that no shot was fired.

A careful reading of the record can but convince one that the deceased, who was a technical sergeant in the United States Army, had in the early part of the evening of September 20, 1942, gone into the vicinity where the cabins of defendant and Corporal Sanders were located. There is some evidence that he had been keeping company with a young lady who had lived in close proximity there, and he had been at her cottage on the Thursday evening prior to the killing on Sunday, and she had moved away in the meantime. There was also conflicting evidence as to whether deceased had been drinking, or was under the influence of liquor at the time of the

killing. But there can be no doubt that deceased was peeping into the windows of Mrs. Sanders' cabin while her husband was gone, as they testified, and that the witness Sanders contacted deceased as above set forth, and that deceased fired a shot either at Sanders or over his head. Seven different witnesses, most of them disinterested, testified to hearing three shots, and at about the same intervals. Some of these witnesses, including Mr. Harris, whose testimony was very fair and could not be doubted, testified for the state. It makes no difference whether this shot was fired from an automatic 45 or a regular 45.

Under the evidence we are of the opinion that defendant did not commit any act up to the time of the killing of deceased that any citizen might not have done under similar circumstances. He had been notified of the conduct of the party toward his neighbor and tenant, Corporal Sanders. His own wife and Corporal Sanders' wife were at his home and were very much frightened by what had transpired.

By what we have said we do not mean that the defendant had the right to discharge his gun over the head of deceased, even on his own premises, or that he had the right to shoot the deceased as he did. That was a question to be decided by the jury from all the facts and circumstances in the case, after hearing the instructions of the court, including the law of self-defense, as justified by the evidence.

But the right of the defendant to arrest the deceased under the circumstances and take him to the military police cannot be questioned. A careful reading of the statute as quoted in the instruction reveals that the defendant had complied with its terms in a very reasonable

manner. There can be no question that deceased had committed several public offenses. It was an offense to be peeping into the window of private individuals and to trespass upon their property. If the deceased was under the influence of intoxicating liquor, or carrying a gun unlawfully, he was subject to arrest. The defendant had been informed of these facts by Corporal Sanders, and a few minutes thereafter he had seen the deceased under circumstances which justified the belief that they were true. He had also been informed of the firing of a shot, which he himself had heard, and which was a felony and would justify the arrest of deceased, even though not committed in his presence. He certainly had reasonable grounds to believe that the person he arrested had committed such offenses.

The defendant reasonably complied with that provision of the statute requiring him to inform the person of the reason of his arrest. He informed him he was taking him to the military police, and his arrest was "immediately after its commission." There was no delay in his attempt to take deceased "before a magistrate or deliver him to a peace officer." And while the defendant made no attempt to disarm the deceased, it cannot be said, under the circumstances of this case, that he acted other than any other citizen would have acted under similar circumstances.

From this statement it will be noted that the defendant did not fail to comply with every provision of the statute in a reasonable manner with reference to the arresting of deceased; yet the court, after instructing the jury in the terms of the statute, gave the following:

"Therefore, gentlemen of the jury, if you find and believe beyond a reasonable doubt that the defendant did

make an arrest of the deceased Kucza but failed to comply with any one or all of the above-quoted statutes applicable to such arrest, then and in that event the defendant would be engaged in an unlawful act and could not invoke the doctrine of self-defense."

Under this instruction, if the jury found that the defendant had failed to take "all offensive weapons which he may have about his person", they then had the right to conclude that he was "engaged in an unlawful act and could not invoke the doctrine of self-defense."

The facts were that it was 15 or 20 minutes after his arrest, and after they had gone some distance, before the killing occurred and at which time defendant claimed that he acted in self-defense in shooting deceased when he attempted, as he believed, to draw a gun for the purpose of killing or doing great bodily injury to the defendant. Certainly an instruction that defendant would be deprived of the right of self-defense under the circumstances above stated would be to the prejudice of defendant and deprive him of a substantial right. The harmless error doctrine should not be applied as to this instruction.

It is next cited as error that the court erred in giving instruction No. 10, as follows:

"Gentlemen of the jury, you are further instructed that if you find from the evidence that the deceased Kucza was trespassing upon the property, real or personal, of the defendant Wingfield, such being the fact, it would not excuse or authorize the defendant in assaulting the deceased Kucza in pointing a gun at him in order to require him to desist from such trespass. No individual has any right to assault another with a deadly weapon by pointing a gun at him because of the fact that such person is trespassing upon the land of another. A mere trespass upon the property of another, even after the

trespasser has been warned to depart and has refused, does not justify the property owner to use a dangerous or deadly weapon to resist the trespass, so if one offers to use a dangerous or deadly weapon against such a trespasser, he is guilty of an assault; a person may resist a trespass on his property, real or personal, not amounting to a felony, or removal or· destruction of property not feloniously attempted, by the use of any reasonable force, short of taking or endangering life, but if he is unable to prevent it, and there is no felony attempted, he must suffer the trespass and the loss of property and seek redress at the hands of the law, rather than commit homicide.

"Therefore, gentlemen of the jury, if you find beyond a reasonable doubt that the defendant did resist a trespass upon his property by the deceased Kucza and did make use of a dangerous and deadly weapon in resisting said trespass, then and in that event the defendant would be acting without authority of law and could not invoke the doctrine of self-defense."

In view of what we have said with reference to instruction No. 9 and the evidence, we think it was unnecessary for the court to give this instruction. While as an abstract proposition of law it may be correct, yet as applied to the facts in this case it could not but have been prejudicial to the defendant. The accused presented a plea of self-defense. The question of trespass upon the property of the defendant had no connection with the issue of self-defense at the time of the homicide. The instruction that if defendant used a dangerous and deadly weapon "in resisting said trespass that he would be acting without authority of law and could not invoke the doctrine of self-defense" had the effect of depriving the defendant of a substantial right, the right of self-defense at a time long after the question of trespass was involved. Gibbons v. Terr., 5 Okla. Cr. 212, 115 P. 129.

It is unnecessary to consider other assignments of error made in this case. They will not occur on a retrial of the same.

It is not to be understood that this case is reversed upon the facts, but alone upon errors in the instructions, as above set out.

For the reasons above stated, the judgment of the district court of Muskogee county is reversed and the case remanded.

JONES, J., concurs. DOYLE, J., not participating.