**Amlean BERRY, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A-12574.**

Criminal Court of Appeals of Oklahoma.

May 28, 1958.

Cecil W. Rote, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

The plaintiff in error, Amlean Berry, hereinafter referred to as defendant, was charged by information filed in the district court of Oklahoma County with murder, was tried before a jury, who found him guilty of the included offense of manslaughter in the first degree, and assessed his punishment at imprisonment in the State Penitentiary for a term of sixty years.

Counsel summarizes the evidence of some six witnesses for the State and three, including the defendant, for the defendant, as follows:

"Leroy Williams was killed on or about the 17th day of February, 1957; that on the afternoon of February 17, 1957 some time between three o'clock p. m. and 4.30 p. m. the said Leroy Williams went to the apartment at 1216 S. Walker Street in Oklahoma City, Oklahoma, which was occupied by the defendant (plaintiff in error here) and one Louise Morris; that during the time said Leroy Williams remained at said apartment or in the immediate vicinity thereof an altercation occurred between the said Leroy Williams and the defendant (plaintiff in error here) and in the course of said altercation the said Leroy Williams received a mortal [knife] wound which caused the death of the said Leroy Williams on the 18th day of February, 1957." [The evidence further shows that the two combatants were Negroes.]

The above is an accurate general statement by counsel for the defendant, of what

the record reveals happened as to the crime charged.

· For reversal counsel advances two specifications of error, as follows: First, that the trial court erred in overruling defendant's demurrer to the evidence of the State for the reason that the State's evidence was insufficient to convict said defendant; and, second, that the trial court erred in overruling the motion of the defendant for a new trial.

By reason of the propositions advanced, it will now be necessary to set out in more detail the evidence of the various witnesses to determine if such was sufficient to support the verdict and judgment complained of.

A. W. Greerson, police officer with the Oklahoma City police department, testified that he was in police car No. 7 on February 17, 1957 and was directed to 1216 South Walker, Oklahoma City, about 4:30 P.M.; that his partner Paul Ming was with him; that on arriving at the address he saw a man lying on what was apparently a car seat on the front porch; that he noticed what appeared to be a stream of blood leading from the wounded person into the building and up a flight of stairs into apartment No. 11; that he knocked on the door and one Louise Morris came to the door; that he asked her if that was the place where Leroy Williams (the injured man) lived, and she said, "No, he lives in the apartment in the back." That he further asked her if there was anyone else in the room with her, and she motioned with her head to the back room; that he entered the room and saw the defendant, Amlean Berry, eating.

Witness further testified that defendant went down stairs with him and to the rear of the building and pointed out LeRoy Williams' apartment, and that one Louise Featherstone, with whom Williams lived, was there awaiting Williams. That he decided to take the defendant and Louise Morris to headquarters, which he did.

There was a recess in the trial, and then it was stipulated between defense counsel and that of the State that the witness would testify that the shirt and sweater of the deceased had or showed a cut on the left front of each through the fabric as though made by a knife having a blade about one inch wide; that the garments were blood soaked on and around the cuts. There were further stipulations, not necessary to mention.

Witness also was shown a knife marked State's Exhibit 1, and said that he found the knife on February 17, 1957, lying on the roof of a one-story building approximately 20 feet behind the two-story building where defendant lived. He said that he found the knife after he talked to defendant, and that Officer Ming was with him, and also Officers Sullivan and Pierce of the Oklahoma City police department. He said that later he questioned defendant concerning the knife in question and that defendant denied that the knife was his.

Louise Morris in effect testified that the deceased came to apartment No. 11 located at 1216 South Walker, at about the hour of 4 P.M. on February 17, 1957, looking for his wife, and at that time the defendant was not present and that the deceased thereafter left. That in about ten minutes thereafter the deceased again appeared at Apartment 11, whereupon there was conversation between the defendant and deceased, which she did not clearly hear or understand, due to the fact that she was lying down in the bedroom of the apartment. She further testified that the knife used in the stabbing of Leroy Williams was her kitchen knife, and on the morning of the altercation was in the kitchen and was used by her, and that the handle had cracked and she had taped the handle.

Witness further testified that defendant had been drinking on February 17, 1957, and that she did not see the deceased strike the defendant.

Dr. Roy Crane, who attended the defendant during his last hours, said that he first saw deceased at approximately 5 P.M., February 17, 1957 and that he died at about 5 A.M. on February 18, 1957, as a result of a stab or knife wound in the heart.

Donald M. Rogers, police photographer and fingerprint technician, testified to taking pictures, state's exhibits 1 through 15, showing the knife, the blood stains from the front porch up to the door of defendant's apartment, etc.

Don Cochran, detective with the Oklahoma City police department, testified that he and his partner, Bob Hudson, on February 18, 1957, investigated the homicide in question and that they had a conversation with the defendant, which was taken down on a recording machine, and subsequently typed out by a reporter and submitted to the defendant, who made one or two minor corrections and signed the statement, which was witnessed by witness and B. A. Hudson. This statement was received in evidence, and reads as follows:

"This is the statement of *Amlen* Berry, 32, of 1216 South Walker. This statement is relative to the stabbing and death of Leroy Williams, 60, also of 1216 South Walker, in the rear. This occurring in the afternoon of February 17, 1957 in the house of 1216 South Walker. This statement is being taken in the detective bureau of the Oklahoma City police department at 9:15 a. m., February 18, 1957 in the presence of detective Don Cochran and myself, Bob Hudson.

"Now, Berry, this statement is being given by you of your own free will and accord. You haven't been promised anything, nor have you been threatened in any way in order to obtain this statement from you.

"Q. Is that right? A. Yes, sir, that's right.

"Q. Now what you say in this statement is true and correct to the best of your knowledge, is that right? A. That's right.

"Q. We want to advise you at this time that what you say in this statement can be used in court in the event of prosecution. Is that clear? A. Yes sir.

"Q. Now, you may start and tell what happened at this time—at the time you and LeRoy Williams had trouble yesterday afternoon on the seventeenth. You may start now. A. Ah, Leroy Williams, his wife came to the house first. She was talking to my wife, so she asked where Leroy was, 'cause she didn't see him. So she went out and Leroy came. He started cussing my wife 'cause she was not there. So I asked him why don't he quit talking to my wife like that. He hit me behind the head first and then I just got the knife and I struck him with it and pushed him out the door down the stairs.

"Q. Ah, where were you whenever you struck him with the knife, Berry? A. I was in my door.

"Q. In your door? A. Yes.

"Q. That's leading from your apartment into the hall? A. Yes.

"Q. Then did you fight some in the hall? A. No, sir, I didn't fight.

"Q. And where did you get this knife? A. Off of my eating table.

"Q. Off an eating table? A. Yes, sir.

"Q. And what was Williams—what was Leroy doing at the time you struck him? A. He was scuffling with me.

"Q. And did Leroy have anything in his hands that he was fighting with? A. Well, I didn't know if he did—he might have had something in his pocket.

"Q. He might have had something in his pocket? A. Yes, sir.

"Q. You didn't see anything in his hands? A. No, sir, I didn't see anything in his hands. He was—

"Q. He was doing what? A. He was closing his fist up to fight.

"Q. Closing his fists up to fight? Is that what you said? A. Yeh, after he hit me—after he hit me—he hit me with the side of his hand.

"Q. He hit you in the back of the head with the side of his hand? A. That's right.

"Officer Cochran, do you have any questions?

"Q. Berry, just prior to you stabbing Williams—A. Yes, sir.

"Q. Williams' wife, Lucy Mae, came to your apartment, is that correct? A. That's correct.

"Q. Did she go in your apartment? A. She came in the apartment—

"Q. And said she was looking for her husband, Williams, is that correct? A. Yes, that's right, she had moved from where she was—she had been out all night—I guess she had run off.

"Q. All right—and she left? A. And she left.

"Q. Then Williams came in? A. Yes, he came.

"Q. About how long was it after she left? A. Well, I would say that it was about twenty minutes.

"Q. About twenty minutes. He came to your apartment? A. He came to my apartment and knocked on the door.

"Q. Knocked on the door? A. Yeh.

"Q. And you let him in? A. My wife let him in.

"Q. Let him in and—you were sitting where? A. I was at the table—at the eating table, eating dinner.

"Q. And he inquired about his wife? A. Un huh, that's right.

"Q. What did you tell him? A. I didn't tell him anything; my wife told him that she just had left from up there. So she—he got started cussing her. I asked him to hush, that I don't want that in my house and he hit me back of the ear then.

"Q. And he turned and started toward the door, is that right? A. No, he didn't start—he started to fight. So I pushed him toward the door—told him to go on out of there.

"Q. And as you pushed him toward the door then, you stabbed him? A. Yes, he started to scuffling, so I just stopped him with the knife.

"Q. You stopped him with the knife? You stuck him with the knife, and then you went on out into the hall with him, is that right? A. No, I didn't go out in the hall with him. I just went to the door.

"Q. Well, as you told us a while ago, you pushed him down the stairs. A. I did, I give him a shove—you see these stairs is right in front of my door.

"Q. I see. A. I just give him a shove and he went on down the stairs.

"Q. Berry, your apartment number, is what? A. Number 11.

"Q. And that is on the second floor? A. On the second floor.

"Q. Just at the head of the stairs? A. Just at the head of the stairs.

"Q. And after you stabbed him and pushed him down the stairs— A. Yeh—

"Q. What did you do then? A. I shut the door and went back to eat. Then I went back to eat.

"Q. When did you throw the knife on the roof? A. Just after I eat.

"Q. After you got through eating? A. After eating, I pitched the knife up—

"Q. You pitched the knife where? A. On top of the roof.

"Q. On top of the roof? This knife which I am holding here—this is the same you identified a while ago as the one that you used—is that correct? A. That's correct.

"Q. This is the knife that you used to stab him with? A. Yes, that's correct.

"Officer Hudson: Q. Who was present at that time, Berry, who was at your place—your home? A. Just me and my wife.

"Q. Just you and your wife? And Leroy? A. That's right.

"Officer Cochran, do you have a question? Q. Yes, after this stabbing, what did you do? Did you go check on Williams, to see how bad he was hurt, or anything? A. No, I didn't—I thought he was done gone.

"Q. You thought he was gone? A. Yeh, I thought he was gone.

"Q. What is the next time—what is the next time you saw Williams, then? A. Right after the police came to my apartment.

"Q. About how long was that after the stabbing? A. Ah, it was about thirty minutes, I guess, before the police came.

"Officer Hudson, do you have any questions? A. I believe that pretty well covers it as far as I am concerned. I would like to ask you this—how long have you known Williams? A. Well, I didn't know him—I didn't even know him. But he lived down stairs—I didn't never see him. When he had moved down there I never did see him. I heard him talking down there—talking to his wife—and fighting with his wife and running around down there.

"Q. That all? A. Yes, that's all.

"Q. OK, then there is no more that you would like to add to this statement, Berry? A. Well, I think that's about all.

"Q. OK."

"Signed: *Amlen Berry*. Witnessed by Don Cochran and R. A. Hudson.

█ From the above, it must appear that the trial court did not err in overruling defendant's demurrer to the state's evidence, there being evidence to support a confession of manslaughter in the first degree. See 21 O.S.1951 § 711, subd. 2, reading:

"Homicide is manslaughter in the first degree in the following cases: * * *

"2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon. * * *"

See also Ex parte Bollin, 3 Okl.Cr. 725, 109 P. 288; Wingfield v. State, 81 Okl.Cr. 146, 160 P.2d 945; Coslow v. State, 83 Okl. Cr. 378, 177 P.2d 518; Grindstaff v. State, 82 Okl.Cr. 31, 165 P.2d 846.

The defendant, Amlean Berry, testified in his own defense. He said that he lived in apartment 11 in the two-story house at 1216 South Walker, and that Louise Morris lived with him. He said that she was his wife, and had lived with him for about six months. He said that on February 17, 1957, at about 2 o'clock he was lying in bed and heard Leroy Williams cussing and fighting with his wife because she said that he stayed out all night; that things quieted down and he left and got some chili for his wife to fix, which she did, and that after a while Leroy Williams' wife came up to the apartment asking about a key and that his wife told her they knew nothing about a key, and he asked her to leave and she said that she was going to have him arrested. That he started to eat some chili and in about fifteen minutes Leroy Williams came up and asked about a key, and his wife. That witness' wife told Leroy that his wife had gone, and Leroy called her a liar; that Williams called defendant and Louise Morris vile names as they let him in to see that his wife was not there. Witness said:

"So, I told him to leave, so he said, 'No', he was going to kick your both God-damned asses, then he hit me back of the neck and I turned it up and he hit me again, so I finally got to my feet and rushed into him, and we was scuffling towards the door and he was trying to get something from his pocket and I pushed him out the door and I went back in and in about five minutes he came back to the door, kicking on it, trying to tear it down, and I walked back to the door and I said, I told him, 'Go on ahead, fellow, I don't know nothing about you', and he slung the knife from his hand and he said, 'You son-of-a-bitch, I'm going to kill

you.' Then I unlatched the screen and I knocked the knife from his hand and he had lost the knife in the scuffle and me and him made for the knife, we was scuffling out there in the hall and I caught the blade of the knife and cut my hand and·I pushed him off of the steps, off the stairs, then I still had blood on this knife and then I walked to the sink to wash it off. I didn't know, I hadn't seen this knife or nothing, I didn't know what to do with it. So, when I was walking through the bathroom I pitched it out on his roof. Then I walked back into my room and was eating some chili. When the police came they knocked on the door and my wife let him in. He said, 'There was a man cut up downstairs'. I didn't know that I had struck him that hard."

Witness claimed that Louise Morris had told him that Leroy Williams was a dangerous man when drunk, and that he could tell that Leroy had been drinking. He admitted that he signed the statement that the prosecution had introduced, but said that the officers told him that his wife had already told them everything and that he was scared, and that he tried to tell the officers what happened and that they crossed him up. Defendant admitted that he had· never married Louise Morris. He denied having lived with Floreen Berry or any other woman. He admitted to having been on July 31, 1956, convicted for assault with a dangerous weapon. Defendant finally admitted that he knew Floreen Berry, admitted that he had denied knowing her, but said, "Well, I didn't know whether I should answer that question." He also admitted having lived with Floreen and paying her rent; that a couple of months after he quit living with Floreen he commenced living with Louise Morris. He said that he got a common law divorce from Floreen in a justice of the peace court. He finally said what he meant was that since the present charge, Floreen Berry wanted to get married, and had sent· a waiver up to jail for him to sign.

Defendant introduced evidence to show the bad reputation of the deceased.

In rebuttal, the State produced Floreen Berry who claimed that she and defendant lived together as husband and wife for about one year; that she borrowed money and co-signed as Mrs. Berry with defendant, and co-signed with him for furniture purchased. She said that they quit living together about July, 1956, and that she was then going by the name of Floreen Wiley. She denied ever having gotten a divorce from defendant, or sending him a waiver to sign, but said that defendant was supposed to get the divorce. She denied that she and defendant were ever legally married, but her testimony was to the effect that she was his common law wife.

Louise Morris denied that she ever told the defendant that Leroy Williams was a a dangerous man, and was liable to kill defendant.

The court had previously heard testimony out of the hearing of the jury, and had determined that Louise Morris was competent to testify in the case. This by reason that the evidence showed that defendant had never obtained a divorce from Floreen Berry, or Wiley, with whom he had been living as husband and wife just prior to his co-habitation with Louise Morris.

 We have read the instructions and conclude that the issues were fairly presented to the jury.

As said in Phillips v. State, Okl.Cr., 321 P.2d 724:

"Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, the Criminal Court of Appeals will not interfere with verdict, even if there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to * * * determine the facts."

And in Johnson v. State, 321 P.2d 979, this court said:

"It is necessary for counsel for plaintiffs in error not only to assert error, but to support their contention by both argument and citation of authorities. Where this is not done, and it is apparent that the defendant has been deprived of no fundamental rights, this court will not search the books for authorities to support the mere assertion that the trial court has erred."

In view of the recited versions of the actual stabbing of the deceased, and the evidence of his propensity for violence when drinking, even though there was evidence that defendant had been drinking, we have come to the conclusion that justice woud be served by modifying the judgment and sentence from 60 years incarceration in the State Penitentiary, to 45 years confinement therein, and the judgment as so modified is affirmed.

BRETT, P. J., and NIX, J., concur.